Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Judge WILKINSON and Senior Judge DUPREE joined.
 

 OPINION
 

 MICHAEL, Circuit Judge:
 

 Chapter 11 debtors Maxway Corporation and Danners, Incorporated, by and through their Official Committee of Unsecured Creditors (collectively “Maxway”), brought an action pursuant to 11 U.S.C. § 547(b) to recover preference payments made by Maxway to one of its unsecured creditors, Advo-System, Incorporated (“Advo”). Advo asserted as a defense that the preference payments fell within the ordinary course of business exception in 11 U.S.C. § 547(e)(2) and therefore were not avoidable. The bankruptcy court granted Maxway’s motion for summary judgment, holding that Advo could not satisfy the ordinary course of business exception. The district court affirmed. Advo appeals, and we affirm.
 

 I.
 

 Generally, when a debtor makes a payment to an unsecured creditor within 90 days before a bankruptcy petition is filed, that payment is a “preference.”
 
 See
 
 11 U.S.C. § 547(b). The trustee in bankruptcy may recover such a payment from the unsecured creditor, thereby forcing that creditor to stand at the back of the line with the rest of the debtor’s unsecured creditors. However, the unsecured creditor has several shields with which it can defend against the trustee’s avoidance power.
 
 See
 
 11 U.S.C. § 547(c). One such shield, and a prominent one at that, is found in § 547(c)(2); it is known as the “ordinary course of business” exception. This exception says that the trustee may not avoid a debtor’s payment to an unsecured creditor if the creditor can show, among other things, that the payment was made in the ordinary course of business of the debtor and
 
 *1046
 
 the unsecured creditor (subsection B) and that the payment was made according to ordinary business terms (subsection C). 11 U.S.C. § 547(c)(2). In this case, the debtor, Maxway, made ten preference payments to one of its unsecured creditors, Advo. The issues raised in this appeal are whether Advo can satisfy subsections B and C. Because this circuit has not heretofore adopted a rule of construction for subsection C, we adopt one today, and we conclude that Advo cannot meet it.
 

 II.
 

 Advo is a targeted direct mail marketing company that maintains computerized residential lists organized by zip code. Advo prints a customer’s advertisements and then mails them directly to those households most likely to purchase the customer’s products or services. According to Advo, it is the only direct mail advertising firm to offer its services on a nationwide basis.
 

 Advo’s general business practice is as follows. After an order is received, but before printing and distribution of the customer’s advertisements, Advo estimates the cost of the customer’s order and sends to the customer a standard form “pre-invoice.” That invoice says that “[a]ll distribution and printing services require prepayment.” Advo generally requires its customers to prepay for its services because Advo has to pay postage costs when it mails the advertisements. Then, shortly after the advertisements are mailed, Advo forwards to the customer a final invoice reflecting the actual cost of the order. The actual cost on the final invoice may differ from the estimated cost on the pre-invoice if, for example, the advertisements are sent to fewer or more households than originally anticipated. The final invoice says “net payable on receipt.”
 

 Maxway was a discount retail chain before it went out of business in 1991. Between 1986 and 1990, Maxway was one of Advo’s customers, with Advo printing and distributing Maxway’s direct mail advertisements. On October 7, 1988, Maxway filed a petition under Chapter 11 of the Bankruptcy Code. In the 90-day period preceding the filing of its Chapter 11 petition (July 9, 1988, through October 7, 1988), Maxway made twelve payments to Advo. Two of the twelve payments were prepayments for Advo’s services. The other ten payments, totalling $177,506.33, were payments for services previously rendered. Because these ten payments were, among other things, made on account of an antecedent debt, they were preferences under 11 U.S.C. § 547(b). Of the $177,506.33, Maxway paid around $50,000 by official bank check less than one week prior to the filing of the bankruptcy petition. Before that payment, Maxway had always paid Advo by company cheek.
 

 On August 13, 1991, Maxway brought an action against Advo pursuant to § 547(b) to recover the $177,506.33 in preference payments. Advo answered that the ten preference payments were made in the ordinary course of business and therefore were exempt under § 547(c)(2) from the trustee’s avoidance power. The parties filed cross motions for summary judgment. In an August 6, 1992, order, the bankruptcy court granted Maxway’s motion for summary judgment and denied Advo’s; the court held that Advo could not satisfy subsections B and C of § 547(c)(2). In an October 28,1993, order, the district court affirmed, apparently concluding that Advo could not satisfy subsection C. Advo now appeals to this court. We base our affirmance on Advo’s failure to satisfy subsection C. As a result, we do not reach the issue of whether the payments fit subsection B.
 
 [1]
 

 III.
 

 To repeat, section 547(b) allows a trustee to avoid certain payments made by a debtor
 
 *1047
 
 to its unsecured creditor within the 90-day period preceding the filing of the bankruptcy petition.
 
 [2]
 
 Two major policies drive § 547(b):
 

 First, the avoidance power promotes the “prime bankruptcy policy of equality of distribution among creditors” by ensuring that all creditors of the same class will receive the same pro rata share of the debtor’s estate. Second, the avoidance power discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor and offers a concurrent opportunity for the debtor to work out its financial difficulties in an atmosphere conducive to cooperation.
 

 Morrison v. Champion Credit Corp. (In re Barefoot),
 
 952 F.2d 795, 797-98 (4th Cir.1991) (citations omitted) (quoting H.R.Rep. No. 595, 95th Cong., 2d Sess. 178 (1978),
 
 reprinted in
 
 1978 U.S.C.C.A.N. 5963, 6138);
 
 see also Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.),
 
 956 F.2d 479, 488 (4th Cir.1992) (“Congress was concerned that creditors would race to the courthouse to dismember the [debtor] or that a debtor would favor certain creditors over others”).
 

 Advo concedes that the ten payments at issue here are preferences under § 547(b). However, Advo argues that the payments are not avoidable because, Advo says, the payments fall within the ordinary course of business exception in § 547(c)(2). Section 547(c)(2) says that the trustee may not avoid a transfer:
 

 to the extent that such transfer was—
 

 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 

 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 

 (C)made according to ordinary business terms.
 

 Advo has the burden of proving by a preponderance of the evidence that each payment satisfies each of § 547(c)(2)’s three subsections.
 
 See
 
 11 U.S.C. § 547(g);
 
 Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.),
 
 957 F.2d 239, 242 (6th Cir.1992). “This inquiry is ‘peculiarly factual.’ ”
 
 Bigelow,
 
 956 F.2d at 486 (quoting
 
 In re First Software Corp.,
 
 81 B.R. 211, 213 (Bankr.D.Mass.1988)).
 

 Maxway acknowledges that the payments were made in the ordinary course of the parties’ business and thus Advo has satisfied subsection A. Whether Advo made its case under subsections B and C is disputed. As we explain below, Advo cannot satisfy subsection C and therefore cannot take advantage of the ordinary course of business exception.
 

 A.
 

 Subsection C says that payments must be “made according to ordinary business terms.” 11 U.S.C. § 547(c)(2)(C). What does this phrase mean? Specifically, what is the appropriate benchmark from which we determine whether a preference payment’s credit terms are “ordinary”? The Code does not tell us. In fact, the Code fails to define any of the phrases in § 547(c)(2). Section 547(c)(2)’s legislative history tells us simply that the “purpose of this exception is to leave undisturbed normal financial relations, because it [such an exception to the trustee’s general avoidance powers] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor’s slide into bankruptcy.” S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978),
 
 reprinted in
 
 1978 U.S.C.C.A.N. 5787, 5874.
 

 Seizing upon the Code’s silence, Advo urges us to use a subjective analysis under subsection C. Specifically, Advo argues that business terms are not unusual so long as they are consistent with the terms used be
 
 *1048
 
 tween the debtor and this particular creditor in their prior course of dealing. However, Advo recognizes that a majority of the federal circuits which have addressed this issue have held that subsection C requires an objective analysis.
 
 [3]
 
 These circuits have said that a preference payment is made according to ordinary business terms if the payment’s terms are not unusual when compared with the prevailing standards in the creditor’s industry. In other words, the benchmark for ordinariness is the norm in the creditor’s industry.
 

 This issue will not detain us for long. The subjective analysis Advo urges us to use under subsection C is the same analysis used under subsection B, which asks whether payments were “made in the ordinary course of business or financial affairs of the” parties.
 
 Cf. Bigelow,
 
 956 F.2d at 488. Because subsections B and C are written in the conjunctive, the use of subsection B’s subjective approach under subsection C would render subsection C superfluous. We refuse to say that Congress wrote a separate subsection for no reason at all.
 
 See In re Tolona Pizza Prods. Corp.,
 
 3 F.3d 1029,1032 (7th Cir.1993) (refusing to “cut out and throw away one-third of an important provision of the Bankruptcy Code [§ 547(c)(2) ]”). To the contrary, Congress had good reason to favor an objective analysis for subsection C, for there are two functions that an objective analysis serves.
 

 One is evidentiary. If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony.... The second possible function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy. .
 

 Id.
 
 In short, we hold that subsection C requires us to look to the norm in the creditor’s industry when determining whether preference payments were made according to ordinary business terms.
 

 But holding that subsection C requires us to refer to an industry norm only gets our foot in the door. We still must figure out how subsection C is to be applied. Specifically, how are we to determine the relevant industry and how much of a departure from that industry’s norm will subsection C allow? To those ends, we have the benefit of two recent, well-reasoned panel decisions from the Seventh and Third Circuits. We summarize these decisions below and adopt their reasoning.
 

 B.
 

 In
 
 Tolona Pizza, supra,
 
 the Seventh Circuit, Judge Posner writing, held
 

 that “ordinary business terms” refers to the
 
 range
 
 of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.
 

 Tolona Pizza,
 
 3 F.3d at 1033 (emphasis in original). The Seventh Circuit’s objective approach to subsection C has two salient features. First, it pragmatically defines “ordinary business terms” to encompass the “broad range” of terms used in the relevant industry. Consequently, the creditor is spared the task of “prov[ing] the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set
 
 *1049
 
 of markets or submarkets which one could plausibly argue comprise the relevant industry.”
 
 Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.),
 
 18 F.3d 217, 224 (3d Cir.1994). Indeed, to suggest that an entire industry should have a single set of credit terms would be inconsistent with antitrust policy.
 
 See id.; Tolona Pizza,
 
 3 F.3d at 1033. Second,
 
 Tolona Pizza
 
 broadly defines the relevant industry to encompass “firms similar in some general way to the creditor,”
 
 id.,
 
 recognizing that in most cases it is “difficult to identify the industry whose norm shall govern,”
 
 id.
 

 The Seventh Circuit’s flexible approach to subsection C was recently adopted and embellished by the Third Circuit. In
 
 Molded Acoustical, supra,
 
 the Third Circuit, Judge Becker writing, “embellish[ed] the Seventh Circuit test ... with a rule that subsection C countenances a greater departure from that range of terms [representative of the industry norm] the longer the
 
 pre-insolvency
 
 relationship between the debtor and creditor was solidified.”
 
 Molded Acoustical,
 
 18 F.3d at 220 (emphasis in original).
 
 [4]
 
 The parameters of this rule are as follows.
 

 Molded Acoustical
 
 says that the extent to which a preference payment’s credit terms can stray from the industry norm yet still satisfy § 547(c)(2)(C) depends on the duration of the debtor-creditor relationship. “[T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2).”
 
 Id.
 
 at 225. A “sliding-scale window” is thus placed around the industry norm. On one end of the spectrum, “[w]hen the relationship between the parties is of recent
 
 origin, or
 
 formed only after or shortly before the debt- or sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry.”
 
 Id.
 
 In such a case, only those “departures from [the] relevant industry’s norms which are not so flagrant as to be ‘unusual’ remain within subsection C’s protection.”
 
 Id.
 
 at 226.
 

 On the other end of the spectrum, “when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C.”
 
 Id.
 
 In any event,
 

 [e]ven when the debtor/creditor relationship has been well-settled prior to the debtor’s insolvency, should the creditor be unable to fit its terms within the sliding-scale window surrounding the established industry’s norm, the preferential transfer will not be deemed unavoidable by virtue of § 547(c)(2), although the terms of §§ 547(c)(2)(A) & (B) are fulfilled. That is to say, the parties’ longstanding credit terms, although consistent as between them, may depart so grossly from what has been established as the pertinent industry’s norms that they cannot be seriously considered usual and equitable with respect to the other creditors.
 

 Id.
 

 The Third Circuit’s sliding-scale approach is a sensible answer to our question about the appropriate benchmark from which one determines whether a preference payment’s credit terms are unusual. At bottom, “[t]he most important thing [as far as the preference statute is concerned] is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period.” Tolona
 
 Pizza,
 
 3 F.3d at 1032. But when the debtor-creditor relationship is of recent origin the industry norm becomes crucial because “there is no baseline
 
 *1050
 
 against which to compare the pre-petition transfers at issue to confirm the parties would have reached the same terms absent the looming bankruptcy.”
 
 Molded Acoustical,
 
 18 F.3d at 226. On the other hand, when the parties have an established relationship, the terms previously used by the parties in their course of dealing are available as a potential baseline. The industry norm, though still relevant, becomes less significant.
 

 Moreover, the Third Circuit’s emphasis on the duration of the parties’ relationship effectuates the two major policies underlying the preference provisions.
 
 See supra
 
 p. 1046-47 (citing
 
 Barefoot,
 
 952 F.2d at 797-98). First, by protecting the usual credit transactions of a business’s established creditors, the Third Circuit’s approach encourages those creditors to extend trade credit when a business is in troubled times. This in turn gives the troubled business a chance to work out its financial difficulties and to sidestep an otherwise imminent bankruptcy proceeding. Second, the goal of an equitable distribution among similarly situated creditors is facilitated because “[t]he likelihood of unfair overreaching by a creditor (to the disadvantage of other creditors) is reduced if the parties sustained the same relationship for a substantial time frame prior to the debtor’s insolvency.”
 
 Molded Acoustical,
 
 18 F.3d at 225. Where the parties’ relationship is not well-established, however, “a significant departure from credit terms normal to the trade bears the earmarks of favoritism and/or exploitation, and to countenance such behavior could be unfair (or could appear unfair) to the remaining creditors who exhibit the virtue of patience.”
 
 Id.
 

 C.
 

 In summary, we hold that subsection C requires an objective analysis and we adopt the Seventh Circuit’s
 
 Tolona Pizza
 
 rule modified and embellished as follows by the Third Circuit in
 
 Molded Acoustical.
 

 [W]e read subsection C as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry’s norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry’s norms which are not so flagrant as to be “unusual” remain within subsection C’s protection. In addition, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C.
 

 Molded Acoustical,
 
 18 F.3d at 226. But subsection C never tolerates a gross departure from the industry norm, not even when the parties have had an established and steady relationship.
 
 See id.
 

 We turn now to apply our newly adopted rule of construction to the facts of the instant case.
 

 IV.
 

 In applying the sliding-scale approach to subsection C, we must first consider what the relevant industry is. Advo argues that the relevant industry is direct mail marketing
 
 on a nationwide basis.
 
 Furthermore, Advo contends that because it is the only direct mail marketing service to offer its services on a nationwide basis, we should use Advo as the relevant industry. In other words, Advo says the industry norm is the standard business practices Advo generally maintains with its customers. Adhering to this view, Advo has presented no evidence on the credit terms used by regional or local direct mail advertisers. Maxway disagrees with Advo’s view of the relevant industry and argues that we should look instead to the business practices of other direct mail market firms which differ from Advo only in the size of their distribution area. The bankruptcy court apparently assumed
 
 arguendo
 
 that Advo was the relevant industry.
 

 We, too, will assume
 
 arguendo
 
 that Advo is the relevant industry and therefore that its general credit practices constitute the relevant industry norm. And we will assume
 
 *1051
 

 arguendo
 
 that the terms of Maxway’s preference payments were consistent with the credit terms used by the parties in their prior course of dealing. Finally, we will assume
 
 arguendo
 
 that the parties’ pre-insol-vency relationship was both steady and well-established. -With these assumptions, to satisfy subsection C Advo would only have to show that the credit terms it extended to Maxway were not a gross departure from the credit terms Advo normally extended to its other customers. However, as explained below, Advo cannot survive summary judgment because it has presented no evidence on the credit terms it normally extended to its other customers. In fact, the record shows that it was unusual for Advo to extend credit to its customers.
 

 A.
 

 Rather than presenting specific credit terms representative of its norm,
 
 e.g.,
 
 the manner, form, amount, and timing of its customers’ credit payments to it, Advo offers a more general characterization of its norm in an effort to satisfy subsection C’s objective standard: Advo argues that its norm was “to work with its customers and [to] extend credit to some customers ... instead of requiring prepayment.” Appellant’s Br. at 32. We think Advo has characterized the industry norm at too high a level of generality.
 
 [5]
 
 Were creditors allowed to characterize the industry norm at such a high level of generality, subsection C could become virtually meaningless. A simple example will make the point.
 

 Suppose an industry where member businesses typically extend credit. If those businesses, in an effort' to satisfy subsection C, could simply assert, without providing specific evidence on credit terms, that the industry norm is to extend credit, then
 
 every
 
 preference payment received by those businesses would satisfy subsection C. Preference payments are by definition credit payments and therefore would never be unusual vis-a-vis that proffered norm. Yet within that same industry there likely would be a
 
 range of credit terms
 
 that one would consider to be normal, for example, payment within 30 to 45 days after receipt of an invoice. If a preference payment’s terms do not fit within that normal range of credit terms
 
 (e.g.,
 
 a preference payment made 100 days after receipt of an invoice), then the preference payment would fail subsection C notwithstanding that the extension of credit would not itself be unusual. Such a preference payment may “hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out.”
 
 Clark v. Balcor Real Estate Fin., Inc. (In re Meredith Hoffman Partners),
 
 12 F.3d 1549, 1553 (10th Cir.1993),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994).
 

 Perhaps Advo did not submit evidence on its normal credit terms because, contrary to its assertions, Advo normally did not extend credit or “work with” delinquent customers. Rather, the record clearly shows that Advo’s norm was to require prepayment.
 

 To begin with, the pre-invoice Advo sent to its customers before their advertisements were mailed said, “TERMS $!BUL> ALL INVOICES NET PAYABLE ON RECEIPT.” JA 37. The pre-invoice also said, “All distribution and printing services require prepayment. The Postal Service requires payment prior to the release of your mailing: therefore Advo must receive payment at least 9 days prior to the In Home Date.” JA 38. Advo’s final invoice said, “NET PAYABLE UPON RECEIPT.” JA 42.
 

 The record shows that Advo normally stuck to the terms of its invoices. Advo conceded in response to Maxway’s interrogatories that it required “most all of its other customers [to] pay for its services as well as the postage costs of the advertisements prior to the actual mailing of the advertisements.” JA 7. Advo’s Billing Supervisor, Darrell
 
 *1052
 
 Easterwood, confirmed in his affidavits that “ADVO generally requires its customers to pay for its services in advance of the printing and distribution of the customer’s advertisement,” JA 35, and that “[a]s a general policy, ADVO requested that Maxway pre-pay its services.” JA 40.
 

 Most revealing in this connection is the deposition of Anthony Fuqua, one of Advo’s sales managers and formerly an account representative who worked on the Maxway account. Fuqua confirmed that “payment is expected upon receipt of the pre-invoice,” Deposition of Anthony T. Fuqua, at 17, and that Advo’s “clients understand that they need to get their money in on a quick turn around basis or when they receive an invoice to pay that right away,”
 
 id.
 
 at 28. He explained that Advo “do[es] a cheek to make sure all funds are in before [Advo] produce[s] anything because postage, again, is involved and [Advo] has to pay the postal system before [it] can enter any mail into the postal system.”
 
 Id.
 
 at 18. When asked whether Advo would render new services if a prior invoice was not paid, Fuqua responded that it was company policy that “money has to be in before we mail_”
 
 Id.
 
 at 26.
 

 Fuqua did say that Advo would “work with” customers who were slow in making payments, but he clarified this statement. By “working with” a customer, Fuqua meant that Advo would not necessarily hold up a distribution if a customer’s payment was not received; rather, Advo would contact the customer to find out what the problem was. Fuqua explained:
 

 [F]or a large account like Maxway, obviously we’re not going to slap that account in the face and say, “We ain’t got your check. It’s not going to mail.” We would try to work with the account and find out what’s going on.... So we just say, ‘What’s the problem, is it [the check] on it’s [sic] way,” or “is it going to be here soon,” or “was it someone who was sick that day and didn’t issue the check,” or whatever. We would just investigate each individual issue with each individual client. And we don’t have this problem a lot, but when it happens, you want to find out why it’s happening.
 

 Id.
 
 at 29. The reason Advo did not “have this problem a lot” is because customers generally paid upon receipt of the invoice. Fuqua could come up with only two situations where a customer’s “slow” payment might not be a big deal: where the customer’s check was “in the mail” or where the customer did not receive a timely invoice from Advo’s accounting department. When asked to describe Advo’s reaction if a customer, instead of saying, for instance, that the check was in the mail, said, “I don’t have the funds to pay now,”
 
 id.
 
 at 31, Fuqua answered that he “would be foolish to send their mail out,”
 
 id.
 
 at 32, because Advo would have to cover the postage costs.
 

 In short, the record, which is silent on the credit terms Advo normally extended to its customers, clearly shows that it was unusual for Advo to extend credit and it was unusual for Advo to work with delinquent customers. Advo’s norm was to require prepayment.
 

 B.
 

 To summarize, we do not accept Advo’s argument that a creditor can satisfy subsection C by simply asserting that it was the industry norm to extend credit and to “work with” customers. And even if that argument were acceptable, Advo cannot prevail here because, contrary to its assertion, its norm was to require prepayment rather than to extend credit. Put another way, Advo’s practice of waiving the prepayment requirement for Maxway and of allowing Maxway to pay when it could was a gross departure from Advo’s norm (again, taking Advo’s practices as the industry norm).
 
 See Molded Acoustical,
 
 18 F.3d at 226 (even preference terms consistent with the parties’ longstanding and steady prior course of dealing nevertheless “may depart so grossly from what has been established as the pertinent industry’s norms that they cannot be seriously considered usual and equitable with respect to the other creditors”).
 
 [6]
 

 
 *1053
 
 In the final analysis, our review of the record reveals that there are no genuine issues of material fact. As a matter of law, Advo cannot meet its burden of showing that the preference payments were “made according to ordinary business terms” as subsection C requires. Consequently, Advo cannot take advantage of the ordinary course of business exception to § 547(b)’s avoidance power. Therefore, Maxway is entitled to recover the $177,506.33 in preference payments made to Advo.
 

 Y.
 

 We affirm the judgment of the district court affirming the bankruptcy court’s order granting Maxway’s motion for summary judgment and denying Advo’s motion for summary judgment.
 

 AFFIRMED.
 

 [1]
 

 . Advo argues that the district court applied the wrong standard of review. Specifically, Advo charges that the district court applied a “clearly erroneous,” as opposed to
 
 de novo,
 
 standard when reviewing the bankruptcy court's summary judgment ruling. Maxway disagrees. In any event, regardless of how one might characterize the standard of review used by the district court, our review is
 
 de novo.
 
 We have the "power to determine independently whether summary judgment may be upheld....”
 
 Ross v. Communications Satellite Corp.,
 
 759 F.2d 355, 363 (4th Cir.1985).
 

 [2]
 

 . Specifically, a debtor's prepetition transfer to an unsecured creditor is avoidable if the transfer:
 

 (1) was of an interest of the debtor in property, (2) was to or for the benefit of a creditor, (3) was for or on account of an antecedent debt owed by the debtor before the transfer was made, (4) was made while the debtor was insolvent, (5) was made on or within 90 days of the filing of the bankruptcy petition, and (6) enabled the creditor to receive a greater percentage of its claim than it would under the normal distributive provisions in a liquidation case under the Code. 11 U.S.C. § 547(b).
 

 [3]
 

 .
 
 E.g., Sulmeyer v. Pacific Suzuki (In re Grand Chevrolet, Inc.),
 
 25 F.3d 728, 733 (9th Cir.1994);
 
 Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.),
 
 18 F.3d 217, 223-26 (3d Cir.1994);
 
 Clark
 
 v.
 
 Balcor Real Estate Fin., Inc. (In re Meredith Hoffman Partners),
 
 12 F.3d 1549, 1553 (10th Cir.1993),
 
 cert. denied,
 
 - U.S. --, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994);
 
 Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark,),
 
 9 F.3d 680, 683-84 (8th Cir.1993);
 
 In re Tolona Pizza Products Corp.,
 
 3 F.3d 1029, 1032-33 (7th Cir.1993);
 
 Logan v. Basic Distribution Corp. (In re Fred Hawes Org.),
 
 957 F.2d 239, 243-44 (6th Cir.1992).
 
 But see Marathon Oil Co. v. Flatau (In re Craig Oil Co.),
 
 785 F.2d 1563, 1565 (11th Cir.1986) (per curiam) (lumping together subsections B and C and using a subjective analysis).
 

 [4]
 

 . The Third Circuit also made a minor modification to the
 
 Tolona Pizza
 
 standard by substituting the word "unusual” for “idiosyncratic” to comport with § 507(c)(2)'s legislative history. See 18 F.3d at 224.
 
 Compare Tolona Pizza,
 
 3 F.3d at 1033 ("only dealings so
 
 idiosyncratic"
 
 fall outside scope of subsection C (emphasis added))
 
 with
 
 S.Rep. No. 989,
 
 supra,
 
 at 88,
 
 reprinted in
 
 1978 U.S.C.C.A.N. at 5874 (§ 547 "discourage[s]
 
 unusual
 
 action by either the debtor or his creditors during the debtor's slide into bankruptcy” (emphasis added)).
 

 [5]
 

 .
 
 Cf. Hilts Oil & Transfer, Inc. v. Havana Nat’l Bank (In re Hills Oil & Transfer, Inc.,
 
 143 B.R. 207, 209 (Bankr.C.D.Ill.1992) ("But even assuming that industry practice or standards, in general, was to extend a line of credit through over-drafting of a checking account, the [creditor] further failed to establish the specifics of how such lending would occur and how it would be repaid, and how these specific transactions would compare to what would occur in the banking industry.”).
 

 [6]
 

 . We note that the Third Circuit thought there likely would be a gross departure from the industry norm if, notwithstanding that the parties' longstanding credit terms were consistent between them, "the range of time transpiring between invoices and payment has always varied
 
 *1053
 
 greatly between the parties, because then one cannot feel confident that 'late' payments during the insolvency period were unmotivated by unusual creditor pressure or dictated by the debt- or's financial woes...."
 
 Molded Acoustical Products,
 
 18 F.3d at 226. We assumed above that Advo and Maxway maintained a steady relationship during the pre-preference period. However, the record shows that during the pre-pref-erence period there was great, indeed erratic, variance in how long it took Maxway to pay after it received an invoice that was not prepaid in full: the payment period ranged from 2 days to over 100 days, hitting many
 
 points in
 
 between.