### In re L. BEE FURNITURE CO., INC., Debtor.

### Charles W. GRANT, Trustee, Plaintiff,

### v.

### RENDA BROADCASTING CORP., Defendant.

**Bankruptcy No. 96–1017.
Adversary No. 96–260.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Dec. 21, 1998.

Ronald Bergwerk, Jacksonville, Fl, for plaintiff.

Aaron Cohen, Jacksonville, FL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon Order of Remand entered by the United States District Court for the Middle District of Florida, Jacksonville Division, entered on May 6, 1998, to determine whether certain preference payments were made in the ordinary course of the Debtor's business in accordance with § 547(c)(2). After a trial on September 15, 1998, the Court enters the

following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACTS: [1]

1. Defendant owns a radio station in Jacksonville, Florida. (Tr. at 9.) Debtor advertised with Defendant's radio station from 1991 to 1996.

2. Although the payment terms of Defendant's invoices to the Debtor contained payment terms of "thirty days net," the debtor consistently paid its invoices between 90 and 120 days. (Tr. at 9–10; Def.Ex. 1.) Defendant's other customers usually paid between sixty and ninety days (Tr. at 9.)

3. In the spring of 1995, Debtor decided to increase its advertising on Defendant's station, using a theme of liquidation. (Tr. at 10–11.) At debtor's suggestion, Defendant agreed to extend Debtor's advertising credit, provided the Debtor did not allow any of the invoices to become outstanding past 90 days. (Tr. at 11–12.) This policy was reduced to writing on April 3, 1995. (Def.Ex. 2; Tr. at 12, 24.)

4. Under the parties' arrangement, the Defendant's business manager would telephone the Debtor at the beginning of each month and relate the amount that was in the 90–day aging category. Debtor, at its discretion, would then divide that amount into installments and issue a series of post-dated checks in like amounts. Defendant would pick up the checks and deposit them as they matured. (Tr. at 11–12.)

5. For four months following the agreement, Debtor carried outstanding invoices past 120 days. (Tr. at 19–20.) After August 1995, Debtor did not carry a balance past 120 days. (Tr. at 19–20; Def.Ex. 3.)

6. Following the implementation of this procedure, Debtor forwarded to Defendant multiple series of post-dated checks for past-due invoices. In June 1995, Defendant received two checks for $2,000 each, which were applied against invoice 9511 for February 1995 and invoice 9791 for April 1995. (Tr. at 18.) In July, 1995 Defendant received two checks for $3,900 each which were ap-

---

**1.** The Court adopts the Findings of Fact as enumerated in its initial decision *Grant v. Renda*

*Broadcasting Corp. (In re L. Bee Furniture, Co., Inc.),* 204 B.R. 804 (Bankr.M.D.Fla.1997).

plied to April invoice 9791. (Tr. at 18.) In August 1995, Defendant received one check for $2,478, and one check for $2,006.25 which were applied to invoices 10181 and 10129 for May 1995. (Tr. at 18.) In September 1995, Defendant received two checks for $3,203.81, and one check for $3,203.83, which were applied to invoice 10339 for June 1995. In October, 1995 Defendant received three checks of $3,327.18 each, which were applied to invoice 10535 of July, 1995.

7. On February 23, 1996 Debtor filed for relief under Chapter 7 of the Bankruptcy Code, and Plaintiff was appointed as trustee. (Case Doc. 1.)

8. Plaintiff alleges that within 90 days prior to its bankruptcy filing, Debtor transferred to Defendant the following series of checks, totaling $27,435:

Series A

| Check No. | Amount | Date |
|---|---|---|
| 28752 | $3,600.00 | 11/28/95 |
| 28753 | $3,600.00 | 12/05/95 |
| 28754 | $3,600.00 | 12/06/95 |
| 28755 | $3,675.50 | 12/18/95 |

Series B

| Check No. | Amount | Date |
|---|---|---|
| 29277 | $3,240.00 | 01/10/96 |
| 29278 | $3,240.00 | 01/16/96 |
| 29279 | $3,240.00 | 01/22/96 |
| 29280 | $3,240.00 | 01/30/96 |

(Doc. 1.)

10. The checks in Series A were applied to invoice 10713 of August, 1995. (Tr. at 14.) The checks in Series B were applied to invoice 107359, 10884, and 10885 of September, 1995. (Tr. at 15.)

11. At trial, Defendant stipulated that all the elements required to establish a preference under 11 U.S.C. § 547(b) had been met, but argued that the transfers were protected from the Plaintiff's avoidance powers by the ordinary course of business exception of 11 U.S.C. § 547(c)(2).

12. This Court held that the payments were protected under the ordinary course of business exception of § 547(c)(2) and entered Judgment for the Defendant on January 15, 1997. (Doc. 16.) In so finding, the Court construed all sections of § 547(c)(2) subjectively, focusing on the specific business relationship of the parties rather than industry practices.

13. Plaintiff filed a Notice of Appeal from the Judgment and the proceeding eventually came before the Honorable Harvey E. Schlesinger, United States District Judge, Middle District of Florida, Jacksonville Division (Case No. 97–158–Civ–J–20.)

14. Judge Schlesinger reversed and remanded the Judgment entered by this Court for reconsideration and further proceedings (as appropriate), in light of the Eleventh Circuit's decision in *Miller v. Florida Mining and Materials (In re A.W. & Assoc., Inc.)*, 136 F.3d 1439 (11th Cir.1998). (Doc. 21.) In *In re A.W. & Associates, Inc.*, the court found that pursuant to § 547(c)(2)(C) bankruptcy courts are required to examine industry standards.

15. Therefore, the sole issue currently before the Court is whether Defendant has met its burden of proof on ordinary business terms under § 547(c)(2)(C).

### CONCLUSIONS OF LAW

■ Plaintiff asserts that the procedure utilized by Debtor and Defendant to pay delinquent bills was so idiosyncratic as to exclude it from ordinary business terms. Plaintiff argues that not only the age of the debts paid, but the method of payment by post-dated checks was unusual for the industry. Plaintiff points out that this Court, in its prior Findings of Fact and Conclusions of Law found the procedure to be "unique" and "unusual".

Defendant asserts that the timing of the payments made by Debtor to Defendant was within the standards and practices in the radio advertising industry. Defendant introduced evidence that sixteen of its radio stations accept the vast majority of its payments between sixty and ninety days from the date of issuance of the invoice.[2] Defendant also

---

**2.** It would have been preferable for the parties to submit independent evidence of companies other than those owned by Renda. However, given the

argues that the method of payment (post-dated installment checks) was not "idiosyncratic". Defendant asserts that the method of payment was cemented in long before the Debtor filed bankruptcy.

In *A.W. & Assoc.* the Eleventh Circuit Court of Appeals endorsed the reasoning of the Seventh Circuit Court of Appeals as set forth in *In Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993):

> '[O]rdinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*A.W. & Assoc.*, 136 F.3d at 1443.

Plaintiff argues that because in its previous Findings of Facts and Conclusions of Law, (Doc. 15), this Court found the situation between the Defendant and the Debtor to be "unique" and "unusual", this Court must now find the relationship so idiosyncratic that it falls outside the scope of § 547(c)(2)(C).

The Court must attempt to glean a precise definition of industry standards from *A.W. Assoc.*, which is unfortunately difficult to do given the short shrift given the issue in the opinion. However, the Court looks to the cases relied on by *A.W. Assoc.* for guidance.

Not only does the Eleventh Circuit approve of the decision in *Tolona*, but it also cites approvingly to *In re Molded Acoustical Prods.*, 18 F.3d 217 (3d Cir.1994). *A.W. Assoc.* paraphrases a holding in *Molded Acoustical* parenthetically, signifying its acceptance of the theory applied by the Third Circuit Court of Appeals in *Molded Acoustical* ("range of permissible deviation from industry standards determined by extent to which the relationship between the parties is 'cemented' "). *A.W. Assoc.*, 136 F.3d at 1443.

The court in *Molded Acoustical* had to determine whether the pattern of the debtor's payments to its preference creditor had changed during the debtor's period of insolvency. As here, the sole issue before the Court was the interpretation of

evidence presented, the Court will precede on

§ 547(c)(2)(C). The court began its analysis by looking to the legislative history of § 547(c)(2), which revealed that " '[t]he purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' " *Molded Acoustical*, 18 F.3d at 223 (citing *J.P. Fyfe*, 891 F.2d at 70). The court noted its approval of the decision in *Tolona*, however it embellished the Seventh Circuit's "idiosyncratic" test. *Id.* at 220. The ultimate holding in *Molded Acoustical* evolved through the court's analysis of the purpose of the preference provisions as well as the importance of encouraging creditors to extend credit to their long-term customers when those customers begin to have financial difficulties. *Id.* at 224–25. This analysis led the court to the following conclusion:

> [T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2). The likelihood of unfair overreaching by a creditor (to the disadvantage of other creditors) is reduced if the parties sustained the same relationship for a substantial time frame prior to the debtor's insolvency.

*Id.* at 225.

The court acknowledged that its approach in some ways resembled that of subsections (a) and (b) of § 547. *Id.* at 225. However, the court also made sure to point out that even where there is a longstanding relationship, the credit terms may so grossly depart from industry standards that they would be considered unusual. *Id.* at 226.

The United States Court of Appeals for the Fourth Circuit has also adopted *Molded Acousticals'* embellished *Tolona* approach to § 547(c)(2)(C). *Contra Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30 (2d Cir.1996). In *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir.1994), the

the facts before it.

court characterized the *Molded Acoustical* interpretation of subsection (c) as a "sliding-scale window". *Id.* at 1049. The court stressed the importance of the history between the debtor and the creditor prior to the preference period. *Id.* at 1049. The importance of the lack of any long-term debtor-creditor relationship was also noted, the court finding that an established relationship at least creates a baseline to which the preference period credit terms can be compared. *Id.* The court ultimately concluded that it would follow the approach set forth in *Tolona* as further embellished by *Molded Acoustical,* and also agreed that a gross departure from the industry norm would not suffice even in the presence of an established relationship. *Id.* at 1050.

■ This Court agrees with the Third and Fourth Circuits that the more established the debtor's relationship with a creditor, the more the parties will be permitted to deviate from industry standards. The Court finds that this approach will protect the unusual business relationship between a creditor and its established customers, as well as promote the purpose of the preference section. *See Advo–System,* 37 F.3d at 1050; *Molded Acoustical,* 18 F.3d at 225. Remaining creditors are not injured if the parties were simply continuing a long-standing practice of debt collection. *Advo–System,* 37 F.3d 1044 at 1050; *Molded Acoustical,* 18 F.3d at 225. In the absence of over-reaching by a creditor who has an established business relationship with the debtor, the purpose of the preference section, i.e. the equal treatment of creditors, is fulfilled. *Tolona,* 3 F.3d at 1032 ("[One] ... function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the other in the event of bankruptcy.").

■ The Court must now determine whether the Debtor and Defendant's practices fall within the sliding scale window of § 547(c)(2)(C) so as to be considered within industry standards. The Court must therefore answer the following questions:

1. What is the industry standard?

2. Does the practice between the parties meet that standard?

3. If so, § 547(c)(2)(C) has been satisfied;

4. If not, look to the history of the parties' relationship and credit practices.

5. If the relationship and practice are not established, the practice falls outside industry standards and fails the test under § 547(c)(2)(C).

6. If the relationship and practice are long-standing and are not gross departures from the industry norm, § 547(c)(2)(C) has been satisfied.

Although Defendant's invoices required payment in thirty days, Weatherby testified that most customers pay within 60 to ninety days, with other customers paying later than ninety days. Larry Garrett also testified that the "window" is 90 days. (Pl.Ex. 1A at 16, lines 15–17.) The Court finds this evidence sufficient to establish an industry norm of payment within the sixty to ninety-day time period.

The practice between the Debtor and Defendant obviously does not meet this standard. The Debtor carried invoices up to and even past 120 days. Therefore the Court must now examine the history of the parties' credit practices.

Debtor first began advertising with Defendant's radio station in 1991. Larry Garrett testified that "[Debtor] has been a long term and strong advertising account on our radio station.... In 1993, 1994, and 1995, as an account, [Debtor] would have been one of our top ten billing accounts on the radio station." (Pl.Ex. 1A at 9, lines 18–25.) The Debtor began its practice of paying amounts within the ninety-day aging category by a series of post-dated checks in April, 1995, some ten months prior to filing bankruptcy. Garrett testified that there were occasions in 1992 and 1993 that involved temporary payment schedules with the Debtor, but nothing permanent as in 1995. (Pl.Ex. 1A at 23, lines 20–24.)

The Court finds that the Debtor and Defendant had a long-standing, established relationship long before the Debtor's "slide into bankruptcy". (quote). Therefore, the Defen-

dant is allowed some leeway from the industry standard of payment within sixty to ninety days. The Court believes that given the relationship between the parties, the late payments made by Debtor to Defendant fall within the sliding scale window of industry standards pursuant to § 547(c)(2)(C). The Debtor was one of Defendant's valuable customers; long before the Debtor filed for bankruptcy the Defendant attempted to work with the Debtor in order to help it stay in business. There was no overreaching here on behalf of Defendant, rather a legitimate attempt at maintaining a profitable relationship with a long-term customer.

The Court's inquiry is not at an end, however. Not only did the Debtor pay its invoices untimely, but it used a series of postdated checks to pay its debt in order to keep its invoices within the 120 day mark. Is this method of payment an industry norm?

Testimony from both Weatherford and Garrett establish that this method of payment was not the norm. Weatherford testified that it did not happen on a regular basis and was not ordinary. He also testified that although he had done it in the past it had been with a client with a lot of history. Garrett testified that he had no other accounts in which the regular course was to pick up a series of postdated checks. (Pl.Ex. 1A at 18, lines 13–16).

The Court has previously determined that the parties had an established relationship as well as an established credit practice. Therefore, so long as the practice is not so idiosyncratic as to fall outside the broad range of industry standards, it falls within the sliding-scale window of the industry norm.

The Court holds that the practice between the Debtor and Defendant of issuing a series of post-dated checks is not so idiosyncratic as to fall outside the broad range of industry standards. The relationship between the parties was cemented, therefore the range of permissible deviation from industry standards is much greater than it otherwise would be. *See Molded Acoustical,*

The subject credit practices between Debtor and Defendant began 10 months prior to

the filing date. This is not a case in which a Defendant approached the Debtor in order to harass the Debtor and to obtain more favorable terms than another creditor within the preference period. The Court concludes that Defendant legitimately attempted to cooperate with a long-standing customer. The purpose behind the preference section would therefore be defeated were the Court to find the transactions between the Debtor and Defendant outside industry standards.

### CONCLUSION

The Defendant has proven beyond a preponderance of the evidence that the payments made by the Debtor to the Defendant within the preference period were made in accordance with industry standards. The Defendant has therefore met its burden under each subsection of § 547(a)(2) and the Court holds that the preference period payments qualify as payments made within the ordinary course of business which may not be avoided by the trustee. A separate judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.