**In re L. BEE FURNITURE CO., INC., Debtor.**

**Charles W. Grant, Trustee, Plaintiff,**

v.

**Cosec International, Inc., Defendant.**

**Bankruptcy No. 96–1017–BKC–3P7. Adversary No. 96–300.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Feb. 8, 1999.

See also 227 B.R. 902.

Ronald Bergwerk, Jacksonville, FL, for plaintiff.

Aaron R. Cohen, Jacksonville, FL, for defendant.

## FINDINGS OF FACT AND
## CONCLUSIONS OF
## LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon Order of May 6, 1998, entered by the United States District Court for the Middle District of Florida, Jacksonville Division, to determine whether certain preference payments were made in the ordinary course of business in accordance with § 547(c)(2). After a trial on the issue on October 13, 1998, the Court enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACTS:

1. On February 23, 1996, L. Bee Furniture, Co., Inc. ("Debtor") filed for relief under Chapter 7 of the Bankruptcy Code. (Case Doc. 1.) On May 16, 1996, Charles W. Grant, Chapter 7 Trustee ("Plaintiff"), filed an adversary proceeding to avoid preferential transfers totaling $8,264.00. (Adv.Doc. 1.) In its answer, Cosec International, Inc. ("Defendant") conceded that the payments were preferential transfers, but contended they were protected by the ordinary course of business exception pursuant to 11 U.S.C. § 547(c)(2). (Adv.Doc. 5–6.)

2. Defendant provides advertising, marketing and financial consultation services to furniture retailers throughout the United States and Canada. Defendant contends it is unique in the industry in that they have no competitors that are capable of providing all three services. Debtor has been one of Defendant's clients since 1980, and Defendant has provided Debtor with various advertising campaigns.

3. Debtor typically placed telephonic orders with Defendant for an advertising campaign, and Defendant then prepared and furnished it to Debtor, along with an invoice. The terms of each invoice were "net 10 days."

4. Defendant presented evidence regarding the payment history between the parties from January 1991 to December 1995. The payment history reveals that the "net 10 days" terms were never complied with by Debtor nor enforced by Defendant. Between 1991 and 1995, Debtor made payments as little as ten days past due and as many as 168 days beyond the due date, averaging approximately seventy-five days beyond the "net 10 days" terms. (Debtor's Ex. 1.)

5. Between September 1995 and December 1995, Defendant sent Debtor four invoices totaling $8,264.00. The invoices contained the pre-printed "net 10 days" terms. Debtor paid the four invoices with the following three checks which were cleared during the preference period:

| Check No. | Date Paid | Amount |
|---|---|---|
| 29271 | 12/29/95 | $3,255.00 |
| 29272 | 01/04/96 | $3,045.00 |
| 29273 | 01/21/96 | $2,964.00 |
| | **TOTAL** | **$8,264.00** |

(Adv.Doc. 10.)

4. Plaintiff sought to recover the $8.264.00, and argued that all three payments were preferential transfers as defined in 11 U.S.C. § 547(b), and

not protected by the ordinary course of business exception under 11 U.S.C. § 547(c)(2). In its post-trial memorandum, Plaintiff conceded that subsection 547(c)(2)(A) was satisfied because the debt was incurred in the ordinary course of business for both Debtor and Defendant. (*Id.*) Plaintiff, however, contended that the payments were not made within the ordinary course of the parties' businesses, nor were they made within ordinary business terms pursuant to 11 U.S.C. § 547(c)(2)(B) and (C). (*Id.*)

5. Defendant asserted that all the elements required to establish a preference under 11 U.S.C. § 547(b) had been met, but argued that the transfers were protected from the Plaintiff's avoidance powers by the ordinary course of business exception of 11 U.S.C. § 547(c)(2).

6. A representative of Defendant testified that: (1) payments were not made as a result of any collection measures; (2) Defendant always accepted late payments and never charged interest on late fees or late payments; (3) Defendant did not threaten to withhold future services unless outstanding balances were reduced; and (4) Defendant made no threats to sue. Testimony was also offered that, Defendant routinely accepted Debtor's postdated checks. (Adv.Doc. 12.)

7. This Court held that the payments were protected under the ordinary course of business exception of § 547(c)(2) and entered Judgment for Defendant on March 20, 1997. (*Id.*) In so finding, the Court construed all sections of § 547(c)(2) subjectively, focusing on the specific business relationship of the parties rather than industry practices.

8. Plaintiff filed a Notice of Appeal from the Judgment and the proceeding eventually came before the United States District Court, Middle District of Florida, Jacksonville Division (Case No. 97–536–Civ–J–20.)

9. The District Court reversed and remanded the Judgment entered by this Court for reconsideration and further proceedings (as appropriate), in light of the Eleventh Circuit's decision in *Miller v. Florida Mining and Materials (In re A.W. & Assoc., Inc.)*, 136 F.3d 1439 (11th Cir.1998). (Doc. 18–19.) In *A.W. & Assoc.*, that court decided that pursuant to § 547(c)(2), bankruptcy courts are required to examine industry standards and practices.

10. Therefore, the issue currently before the Court is whether Defendant has met its burden of proof on ordinary business terms pursuant to § 547(c)(2).

### CONCLUSIONS OF LAW

In his Supplemental Memorandum, Plaintiff contends that because Defendant is the sole provider of a full advertising and marketing support program package to furniture retailers, there is an absence of an industry measuring stick. Therefore, Plaintiff argues that evidence of how Defendant deals with its other customers is insufficient to prove an "industry standard," and thus, the Court is left with an evaluation of idiosyncratic relations. Nevertheless, Plaintiff asserts that, even if an "industry standard" exists, the procedure utilized by Debtor and Defendant to pay delinquent bills was so idiosyncratic as to exclude it from ordinary business terms. Plaintiff argues that not only the age of the debts paid, but the method of payment by post-dated checks was unusual for the industry.

Defendant argues that because it is an industry unto itself, there are no meaningful comparisons of its practices with other companies, and therefore, the way it deals with its customers is the "industry standard". Defendant introduced evidence that it accepts the vast majority of payments from its larger customers between sixty and ninety days from the date of issuance of the invoice. Defendant also introduced evidence that small "mom and pop clients" had payment histories consistent with Debtor. Defendant contends that accepting post-dated checks

and sporadic payments is commonplace in its "industry", and that these methods are not idiosyncratic. Defendant asserts that the method of payment was cemented in long before Debtor entered the Bankruptcy Court.

This Court has previously addressed this very issue on a similar case in its decision in *Grant v. Renda (In re L. Bee Furniture Co., Inc.),* 227 B.R. 902 (Bankr.M.D.Fla.1998). In *L. Bee Furniture,* this Court analyzed the Eleventh Circuit's decision in *A.W. & Assoc.,* 136 F.3d 1439, and those cases relied upon by that court, in order to attempt to procure a precise definition of industry standards. *Id.* at 904–05.

As this Court previously noted, in *A.W. & Assoc.,* the Eleventh Circuit Court of Appeals endorsed the reasoning of the Seventh Circuit Court of Appeals as set forth in *In Matter of Tolona Pizza Products Corp.,* 3 F.3d 1029 (7th Cir.1993):

> '[O]rdinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*L. Bee Furniture,* 227 B.R. at 904–05 (quoting *A.W. & Assoc.,* 136 F.3d at 1443). This Court found that not only did the Eleventh Circuit approve of the decision in *Tolona,* but it also cited approvingly to *Molded Acoustical Prods.,* 18 F.3d 217 (3d Cir.1994). *Id.* This Court also felt it noteworthy that *A.W. & Assoc.* paraphrased a holding in *Molded Acoustical* parenthetically, signifying its acceptance of the rationale applied by the Third Circuit Court of Appeals. *Id.; A.W. & Assoc.,* 136 F.3d at 1443 (finding range of permissible deviation from industry standards determined by extent relationship between parties is 'cemented'). The court in *Molded Acoustical,* as well as this Court on remand in *L. Bee Furniture,* had to determine whether the pattern of debtor's payments to its preference creditor had changed during debtor's period of insolvency. As here, the sole issue before the Court was the interpretation of § 547(c)(2)(C).

This Court found the *Molded Acoustical* court's analysis of the legislative history of § 547(c)(2) particularly persuasive as it revealed that " '[t]he purpose of the exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' " *L. Bee Furniture,* 227 B.R. at 905 (quoting *Molded Acoustical,* 18 F.3d at 223) (citation omitted). While *Molded Acoustical* approved of the decision in *Tolona,* it also embellished the Seventh Circuit's "idiosyncratic" test. *Id.* at 906. The ultimate holding in *Molded Acoustical* evolved from the Third Circuit's analysis of the purpose of the preference provisions as well as the importance of encouraging creditors to extend credit to their long-term customers when those customers begin to have financial difficulties. 18 F.3d at 224–25. This analysis led the court to the following conclusion:

> [T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2). The likelihood of unfair overreaching by a creditor (to the disadvantage of other creditors) is reduced if the parties sustained the same relationship for a substantial time frame prior to the debtor's insolvency.

*Id.* at 225. The court acknowledged that its approach in some ways resembled that of subsections (a) and (b) of § 547. *Id.* However, the court also made sure to point out that even where there is a longstanding relationship, the credit terms may so grossly depart from industry standards that they would be considered unusual. *Id.* at 226.

The United States Court of Appeals for the Fourth Circuit has also adopted *Molded Acousticals'* embellished *Tolona* approach to § 547(c)(2)(C). *Contra Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30 (2d Cir.1996). In *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044 (4th Cir.1994), the court characterized the *Molded Acoustical*

interpretation of subsection (c) as a "sliding-scale window." *Id.* at 1049. The court stressed the importance of the history between the debtor and the creditor prior to the preference period. *Id.* at 1049. The importance of the lack of any long-term debtor-creditor relationship was also noted, the court finding that an established relationship at least creates a baseline to which the preference period credit terms can be compared. *Id.* The court ultimately concluded that it would follow the approach set forth in *Tolona* as further embellished by *Molded Acoustical,* and also agreed that a gross departure from the industry norm would not suffice even in the presence of an established relationship. *Id.* at 1050.

■■■ This Court has previously voiced its agreement with the Third and Fourth Circuits, that the more established the debtor's relationship with a creditor, the more the parties will be permitted to deviate from industry standards. *L. Bee Furniture,* 227 B.R. at 906–07. The Court has found that this approach will protect the unusual business relationship between a creditor and its established customers, as well as promote the purpose of the preference section. *Id.* (citing *Advo–System,* 37 F.3d at 1050; *Molded Acoustical,* 18 F.3d at 225). Remaining creditors will not be injured if parties are simply continuing a long-standing practice of debt collection. *Advo–System,* 37 F.3d 1044 at 1050; *Molded Acoustical,* 18 F.3d at 225. As the Court has further noted, "in the absence of over-reaching by a creditor who has an established business relationship with the debtor, the purpose of the preference section, i.e. the equal treatment of creditors, is fulfilled." *L. Bee Furniture,* 227 B.R. at 906 (citing *Tolona,* 3 F.3d at 1032) ("[One] ... function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the other in the event of bankruptcy.").

The Court must now determine whether this Debtor and Defendant's practices fall within the purview of § 547(c)(2)(C) so as to be considered within industry standards.

The Court must therefore answer the following questions:

1. Does a sole provider of services in an industry, where there are no meaningful comparisons of its practices with other companies, constitute an industry unto itself so that the way it deals with its customers is the "industry standard?"

2. If so, does the practice between the parties meet that standard?

3. If so, § 547(c)(2)(C) has been satisfied;

4. If not, look to the history of the parties' relationship and credit practices.

5. If the relationship and practice are not established, the practice falls outside industry standards and fails the test under § 547(c)(2)(C).

6. If the relationship and practice are long-standing and are not gross departures from the industry norm, § 547(c)(2)(C) has been satisfied.

■■■ It is firmly established that the creditor has the burden of proving, by the preponderance of the evidence, that a transfer was made in the ordinary course of business under § 547(c)(2). 11 U.S.C. § 547(g) (1998); *Advo–System,* 37 F.3d at 1047. Also, as this Court has previously noted, subsection 547(c)(2) should be narrowly construed. *Grant v. Sun Bank/North Central Florida (In re Thurman Construction, Inc.),* 189 B.R. 1004, 1011–12 (Bankr.M.D.Fla.1995) (citation omitted). The issue currently before the Court is whether Defendant has met its burden of proof on ordinary business terms pursuant to § 547(c)(2)(C).

■■■ The initial question this Court will address is whether Defendant's dealings with its customers is the "industry standard" as there are no competitors in the field in which its practices can be measured against. This Court answers that question in the affirmative. The Plaintiff correctly notes that the ordinary business terms test provides an objective standard against which questioned transfers can be compared. This usually requires a court to refer to the range of terms that encompass the practices in which firms similar to the creditor in question engage. *See Molded Acoustical,* 18 F.3d at 219. However, the Plaintiff mistakenly asserts

that a company that cannot be compared to others in a similar industry cannot show that it meets "industry standards." (Adv.Doc. 29.) Plaintiff relies on the Third and Sixth Circuit decisions in *Molded Acoustical,* 18 F.3d 217, and *Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc),* 957 F.2d 239 (6th Cir.1992) to support this proposition. However, as noted by the court in *Molded Acoustical,* § 547(c)(2)(C) allows the creditor considerable latitude in defining what the relevant industry is. 18 F.3d at 226. Further, the court also proposed that an exceptionally large firm may be an industry unto itself, and thus establish the "industry standard" through its own course of dealings. *See Id.* at 227. Moreover, the court in *Fred Hawes* did not reject this proposition, but merely asserted that the industry standard should be determined by looking at the industry as a whole, rather than simply looking to an independent creditor's dealings with its independent customers. 957 F.2d at 246. In *Fred Hawes,* however, the court did not find the creditor to be an industry unto itself, as the case is here. The unrebutted testimony by Defendant's president established that Defendant is the sole provider of services of its kind and has no competitors in its field. Since the evidence confirms that there are no meaningful comparisons of Defendant's practices with other companies, the Court finds that the way it deals with its customers is the "industry standard".

■ Plaintiff also contends that late payments dictated by a debtor's financial woes or terms under which a creditor is simply trying to accommodate a debtor's precarious financial condition are excluded from "industry norms." However, using post-dated checks and accepting late payments are the kinds of terms that Defendant and its customers, including Debtor, used in ordinary circumstances. These practices were not specifically used to aid financially distressed customers. Moreover, if it is the regular practice in the industry of working with delinquent customers on special terms, that will be sufficient to satisfy subsection C. *See Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark.),* 9 F.3d 680, 685 (8th Cir.1993) (holding evidence showing it routine to work with customers in arrears on unique terms sufficient to prove within "industry norm").

Although Defendant's invoices required payment in ten days, the evidence shows that between 1991 and 1995, the ten-day term was never enforced and customer payments ranged from as little as ten days past due to 168 days past due. Also, Defendant never pursued collection or threatened to cease providing services to Debtor. Defendant did not charge interest or late fees to any of Debtor's accounts. Testimony was also offered that Defendant routinely accepted Debtor's postdated checks. (Adv.Doc. 12.)

■ On remand, Defendant produced evidence showing that the sporadic payment history between Defendant and Debtor was commonplace among Defendant and many of its other clients. Defendant's evidence indicates that small clients as well as multi-chain national clients had payment histories consistent to that of Debtor. (Def.'s Composite Ex. 1.) Further, Defendant offered testimony that indicated that such a lag in payment was common within their industry as many clients sat on invoices as a cash flow management tool or simply made payments as their cash flow permitted. The Court finds this evidence sufficient to establish that Debtor's payments to Defendant fall within the industry norm, and thus are not subject to avoidance by the Trustee.

Moreover, even if the practice between Debtor and Defendant did not meet this standard, given their long-standing relationship, Defendant is allowed some leeway from the industry standard of payment.

The Court finds that Debtor and Defendant had a long-standing, established relationship long before Debtor's slide into bankruptcy. Therefore, The Court believes that given the relationship between the parties, the late payments made by Debtor to Defendant fall within the sliding scale window of industry standards pursuant to § 547(c)(2)(C). Debtor first began doing business with Defendant in 1980. For several years before Debtor filed for bankruptcy, Defendant and Debtor utilized these methods of payment in the ordinary course of business. There was no overreaching on behalf

**192**

of Defendant. Rather, it was a legitimate attempt at maintaining a profitable relationship with a long-term customer. This is not a situation where a Defendant was attempting to enforce new payment terms at the expense of other creditors.

The Court has previously determined that the parties had an established relationship as well as an established credit practice. The relationship between the parties was cemented, and therefore, the range of permissible deviation from industry standards is much greater than otherwise allowable. *See Molded Acoustical*, 18 F.3d at 224. The practice between Debtor and Defendant did not grossly depart from what has been established as the pertinent industry norms. Accepting late payments was not so flagrant as to be idiosyncratic, and therefore, the routine falls within the sliding-scale window of the industry norm and remains within subsection C's protection.

Moreover, the Court holds that the practice between Debtor and Defendant of issuing a series of post-dated checks is not so idiosyncratic as to fall outside the broad range of industry standards. The subject credit practices between Debtor and Defendant began several years before the filing date. This is not a case in which Defendant approached Debtor in order to harass Debtor and to obtain more favorable terms than other creditors within the preference period. The Court concludes that Defendant legitimately attempted to cooperate with a long-standing customer. Therefore, the purpose behind the preference section would be defeated if the Court were to find the transactions between Debtor and Defendant outside industry standards.

### CONCLUSION

Defendant has proven beyond a preponderance of the evidence that the payments made by Debtor to Defendant within the preference period were made in accordance with industry standards. Defendant has therefore met its burden under each subsection of § 547(a)(2). The Court holds that the preference period payments qualify as payments made within the ordinary course of business and may not be avoided by the trustee. A separate judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.