In re AIR SOUTH AIRLINES, Debtor.

W. Ryan Hovis, Plaintiff,

v.

Stambaugh Aviation, Inc., Defendant.

Civ.A. No. 97–07229–W.
Adversary No. 99–80030–W.

United States Bankruptcy Court,
D. South Carolina.

Jan. 18, 2000.

H. Flynn Griffin, Columbia, SC, for Plaintiff.

Gina L. Campano, Columbia, SC, for Defendant.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Trustee and Stambaugh Aviation, Inc.'s ("SAI") Cross Motions for Summary

Judgment pursuant to Bankruptcy Rule 7056. After reviewing the pleadings in this matter and considering the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

## FINDINGS OF FACT

1. Air South Airlines, Inc. ("Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 28, 1997. The case was subsequently converted to Chapter 7, and Plaintiff was appointed to act as Trustee.

2. On January 28, 1999, the Trustee ("Plaintiff") commenced this adversary proceeding to recover preferential transfers pursuant to 11 U.S.C. § 547(b).[2] More specifically, Plaintiff seeks the avoidance of a payment from Debtor to SAI dated June 24, 1997 in the amount of $79,403.07 and a payment dated July 7, 1997 in the amount of $70,000.00.

3. On April 30, 1997, SAI and Debtor entered into a maintenance overhaul and repair agreement ("Agreement") whereby SAI would provide maintenance service on an aircraft known as EI–CKW. The Agreement included a specific bid for routine heavy maintenance work (a "C-check") and price quotes for non-routine maintenance work to address problems discovered in the course of the "C-check." The total cost for the non-routine work could not be determined until all of the maintenance work was completed.

4. The Agreement contemplated that it would take SAI approximately twenty-two (22) days from the date of induction[3] to complete service on the aircraft.

5. The Agreement also provided that, in the event of late delivery, SAI agreed to compensate Debtor with a $1,000.00 per day penalty payment for a maximum of 10 days, excluding justifiable delay; and, in the event of early delivery, Debtor in turn agreed to compensate SAI with a $1,000.00 per day early incentive payment for a maximum of 10 days.

6. The Agreement required payments in installments. Thirty-three percent (33%) of the C-check package bid was due upon the aircraft's induction into SAI's work flow. A second payment of thirty-three percent (33%) of the bid was due on the eleventh-day milestone. Of the remaining balance of the bid, fifty percent (50%) of it due upon the return of the aircraft to Debtor. Finally, any remaining balance was due and payable within fifteen (15) days from certified delivery of the final invoice.

7. The induction date was to be on May 4, 1997. However, it was not until May 5, 1997 that SAI issued invoice # 0557 to Debtor for the initial payment of thirty-three percent (33%) of the total bid and it was not until that date that Air South issued check # 081220 in the amount of $63,377.16 for invoice # 0557. SAI received the check on May 6, 1997. Also on May 6, 1997, upon receipt of the first check by SAI, SAI sent Debtor a letter indicating that because Debtors' check was received on May 6, 1997, the official induction date was going to be May 6, 1997. SAI's letter also indicated that "the second payment will be due by the close of banking hours (4:00 p.m. e.s.t.) on May 16, 1997."

---

1. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such; and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

2. Further references to the Bankruptcy Code shall be by section number only.

3. "Induction" is a term of art referring to taking delivery of the aircraft, commencement of the repair, and commencement of the "day count."

8. On May 14, 1997, SAI issued invoice # 0599 for the next thirty-three percent (33%) installment plus materials due on the eleventh-day milestone. The total amount of the invoice was $69,389.16. The invoice indicated that the payment was due on May 16, 1997.

9. On May 16, 1997, Debtor issued check # 018447 in satisfaction of the invoice of May 14, 1997.

10. On May 23, 1997, Debtor issued check # 018575 to SAI in the amount of $63,377.16 to pay unexpected charges which had arisen in the course of the repairs of the airplane.

11. On May 30, 1997, SAI notified Debtor that the repairs would not be completed by the time agreed upon by the parties, due to difficulty incurred in procuring certain parts for the aircraft. The plane was finally released to Debtor on June 11, 1997. As a result of the delay, Debtor invoked the penalty clause pursuant to the Agreement. Although SAI disputed the invocation of such clause, SAI ultimately agreed to a $9,403.07 reduction on the final installment due.

12. On June 13, 1997, SAI issued the final invoice # 0566. The total outstanding balance was $158,806.14. The payment terms of invoice # 0566 specified that 50% of the outstanding balance, or $79,403.07, was due while the remaining $79,403.07 was due "net 15 days" as set forth in the Agreement.

13. On June 12, 1997, Mark Stambaugh, Jr., Vice President of SAI, drafted a letter which he attached to a copy of the final invoice of June 13, 1997. The letter explained that the final invoice would be supplemented by a detailed itemization of the costs. SAI agreed to forward the supplemental documents upon its receipt of them.[4] The letter also acknowledged that payment of the final invoice would be a bit slower than payment on the earlier installments because it was subject to Debtors' review prior to payment.

14. On June 24, 1997, Air South paid fifty percent (50%) of the outstanding balance due with check # 019253 in the amount of $79,403.07. This payment was made eleven days after the date of the final invoice and thirteen days after the delivery of the aircraft to Debtor.[5]

15. On July 7, 1997, Debtor issued check # 019533 for $70,000 in full satisfaction of the balance due.[6] The final payment was nine days after the indicated due date.

## CONCLUSIONS OF LAW

The Trustee is seeking the return of the June 24, 1997 payment of $79,403.07 and the July 7, 1997 payment of $70,000.00 as preferential transfers pursuant to § 547(b) which provides as follows:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;

---

4. In the letter, Mr. Stambaugh wrote: "Back-up documentation and a hard copy are being sent via overnight mail so your personnel can begin review/audit these submitted costs. Since we currently do not have all invoices in-hand, we will forward these as quickly as they are received. In the interim, we have submitted a 'Receiving History Report' for review.... We trust your review will produce no discrepancies, and payment of the charges will be made in full."

5. Courts have held that for purposes of the affirmative defenses in § 547(c), a payment by check is deemed to be effective when the check is received by the creditor. *See, e.g., Durham v. Smith Metal & Iron Co. (In re Continental Commodities, Inc.),* 841 F.2d 527, 528 (4th Cir.1980); *Trinkoff v. Porters Supply Co. (In re Daedalean, Inc.),* 193 B.R. 204, 212 (Bankr.D.Md.1996). In this case, however, there is no evidence as to the date the alleged preferential transfers made by check on June 24, 1997 and July 7, 1997 were received by SAI.

6. SAI and Debtor finally agreed to a reduction of the final payment due to SAI's delay in the release of the plane.

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The parties have agreed that all the elements of § 547(b) are present.[7] The parties disagree on whether the payments were contemporaneous exchanges for new value pursuant to § 547(c)(1) and whether the payments were made in the ordinary course of business pursuant to § 547(c)(2).[8]

**1. Standard for Summary Judgment**

Rule 7056 of the Federal Rules of Bankruptcy Procedure provides "Rule 56 F.R. Civ. P. applies in adversary proceedings." Rule 56 of the Federal Rules of Civil Procedure sets forth the standard for summary judgment and provides that summary judgment "shall be rendered forthwith" if the evidence and pleadings "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "On a summary judgment motion, the Court does not try factual issues, rather, it determines whether there are any fact issues to be tried." *Dunes Hotel Assoc. v. Hyatt Corp. (In re Dunes Hotel Assoc.),* 194 B.R. 967, 976 (Bankr.D.S.C.1995).

In order to prevail on a motion for summary judgment, the movant must show with pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, that no genuine issue of material fact exists; thus entitling the movant to a judgment as a matter of law. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Summary judgment should be granted against a party "who fails to make a showing sufficient to establish the evidence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* It is not until after the movant proves the absence of any genuine issue of material fact that the burden of proofs shifts to the opposing party to "set forth specific facts which controvert the moving party's facts." *In re Dunes Hotel Assoc.,*

7. All the requirements of § 547(b) are met in this case. First, Debtor transferred a total of $149,403.07 to a creditor, SAI, as required by subsection (b)(1). Second, the transfer was on account of an antecedent debt owed by Debtor to SAI before the payment was made as required by subsection (b)(2). Third, Debtor is presumed insolvent pursuant to § 547(f) which provides that "the debtor is presumed to have been insolvent on an during the 90 days immediately preceding the date of the filing of the petition." Fourth, the payments were both made within 90 days prior to the filing of Debtor's Chapter 11 bankruptcy filed on August 28, 1997, as provided by subsection (b)(4)(A). Finally, the parties have stipulated that there will be less than a 100% distribution to unsecured creditors. Because the contract between the parties does not provide that SAI have a security interest, SAI should be considered an unsecured creditor. To the extent that SAI was paid, it received an improvement in position, thus meeting the requirement set forth in subsection (b)(5).

8. The Cross Motions for Summary Judgment address two affirmative defenses: the "new value" and "ordinary course of business" defenses in § 547(c)(1) and (c)(2) respectively. However, the Court does not address the "new value" because it concludes that the payments in question meet the requirement of the "ordinary course of business" defense.

194 B.R. at 976. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548.

## 2. Preferential Transfers

The main purpose of preferential transfer law is to assure that creditors are treated fairly and equitably in the distribution of the bankruptcy estate and are discouraged "from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor." *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1047 (4th Cir.1994); *see also In re Xonics Imaging, Inc.*, 837 F.2d 763, 765 (7th Cir. 1988). The Bankruptcy Code provides several defenses to the trustee's avoidance powers. Section 547(c)(2), for example, sets forth the "ordinary business defense" which protects a preferential transfer if three requirements are met.

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms.

Section 547(g) provides guidance as to who bears the burden to prove that a preferential transfer took place pursuant to § 547(b) and, in turn, to prove that the subject transfer falls within one of the affirmative defenses in § 547(c). More specifically, it provides: "[T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this sec-

tion, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section." Thus, to avail itself of the ordinary course of business exception, SAI bears the burden of proving that the debt, as represented by the invoice of June 13, 1997, was incurred in the ordinary course of the business affairs of Debtor and SAI; that the payments were made in the ordinary course of business of Debtor and SAI; and that the transfers in question fell within the range of terms prevailing in the relevant industry's norms. The Trustee has conceded that the transfers were in payment of a debt incurred by Debtor in the ordinary course of its business. Debtor was a commercial airline which maintained and repaired the aircrafts which it operated in the ordinary course of its business. SAI, in turn, routinely serviced airplanes. Thus, subsection A of § 547(c)(2) is not in dispute in this case. The issues that remain before this Court are whether SAI has met its burden under subsections B and C so that summary judgment may be granted in its favor.

For many years, courts interpreted both subsections B and C as requiring a subjective interpretation which considered whether the challenged transactions were in harmony with the past dealings between the debtor and the creditor. Lawrence Ponoroff and Julie C. Ashby, *Desperate Times and Desperate Measures: The Troubled State of the Ordinary Course of Business Defense—and What to Do About It*, 72 WASH. L.R. 5, 30–31 (1997); *see also Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir.1994). As the Fourth Circuit Court of Appeals noted in *Advo–System, Inc.*, "[b]ecause subsections B and C are written in the conjunctive, the use of subsection B's subjective approach under subsection C would render subsection C superfluous." *Id.* at 1047. The court in *Advo–System, Inc.* concluded that, while subsection B requires a subjective

analysis of the prior transactions between the parties, subsection C requires an objective consideration of the norm in the creditor's industry. *Id.* at 1048. Thus, the creditor has the burden to prove both that the transfer at issue was "made in the ordinary course of business or financial affairs of the debtor and the transferee" *and* that the transfer was "made according to ordinary business terms."

The problem that courts have been presented with is that the Bankruptcy Code fails to define the phrases "ordinary course of business" and "ordinary business terms." Because there is no precise legal test provided in the code, courts have concluded that the determination of whether preferential transfers were made in the ordinary course of business is a "particularly factual" analysis. *See, e.g. In re First Software Corp.,* 81 B.R. 211, 213 (Bankr.D.Mass.1988); *Trinkoff v. Porters Supply Co., Inc. (In re Daedalean, Inc.),* 193 B.R. 204, 211 (Bkrtcy.D.Md.1996).

### 3. Section 547(c)(2)(B) Subjective Test

 The court's determination of whether a transfer was made in the ordinary course of business of the parties is a fact-intensive and subjective inquiry which requires an examination of the business practices of the debtor and creditor. *See, e.g. Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.),* 182 B.R. 728, 736 (Bankr.W.D.Va.1995) (quoting *Yurika Foods Corp v. UPS (In re Yurika Foods Corp.),* 888 F.2d 42, 45 (6th Cir.1989)) ("[T]he relevant question is not whether the transactions were ordinary with respect to some objective standard in the industry, but whether they were 'consistent with the course of dealings between the particular parties.'"); *see also Logan v. Basic Distrib. Corp. (In re Fred Hawes Org.),* 957 F.2d 239, 244 (6th Cir.1992) ("The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor."). In examining the course of

dealing between the parties, courts engage in a thorough analysis including "'timing, the amount and manner a transaction was paid [sic] and the circumstances under which the transfer was made.'" *In re Valley Steel Corp.,* 182 B.R. at 736 (quoting *In re Yurika Foods Corp.,* 888 F.2d at 45).

 The Trustee first argues that SAI is not able to show that the transfers at issue were made in the ordinary course of business between Debtor and SAI because the Agreement entered between the parties was the first and only contract ever entered into between them. Therefore, the Trustee concludes that there is no established course of dealing between the parties. Furthermore, the Trustee also indicates that the two preferential payments which he is seeking to avoid pursuant to § 547(b) were not made in compliance with the terms specified in the contract. The contract indicated that Debtor was to pay 50% of the remaining balance when the plane was released, which occurred on June 11, 1997. The final installment was due under the terms of the contract 15 days after the certified delivery of the final invoice. According to the Trustee, the payment terms on the contract were breached because Debtor paid 50% of the balance indicated on the June 13, 1997 invoice on June 24, 1997, 13 days after the aircraft was released; and the final payment was made July 7, 1997, eleven days after the date specified on the contract and the invoice.

The Court disagrees with the Trustee's reasoning. The Court recognizes the fact that the parties had never entered into a prior transaction before the Agreement was entered into. Four payments took place between the parties, two of which are being challenged by the Trustee because they fall within the preference period; but all payments were pursuant to the one and only Agreement that SAI and Debtor ever entered into. Where the debtor and the creditor do not share a prior course of dealing, some courts have held, as argued

by the Trustee, that the ordinary course of business exception cannot be used as an affirmative defense. The court in *In re Brown Transport Truckload* held that "[i]f there is no prior course of dealings between the parties, the transferee cannot satisfy [§ 547(C)(2)(B) ], and the transfer may be avoided." *Brizendine v. Barrett Oil Distributors, Inc. (In re Brown Transport Truckload),* 152 B.R. 690, 691 (Bankr. N.D.Ga.1992). However, this Court rejects this conclusion and follows the opinions of other courts that have held that subsection B does not require " a history of prior dealings as a sine qua non in order to afford a transferee the protections of § 547(c)(2)." *Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.),* 92 B.R. 737, 740 (W.D.Mich.1988); *see also Gosch v. Burns (In re Finn),* 909 F.2d 903, 908 (6th Cir.1990) ("Obviously, it is easier to find 'ordinary course' if a transaction is indeed one of the 'recurring, customary credit transactions' with regard to the particular borrower .... Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time. We hold that, as a general rule ... a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer."); *Solow v. Ogletree, Deakins, Nash, Smoak & Stewart (In re Midway Airlines, Inc.),* 180 B.R. 1009, 1013–14 (Bankr.N.D.Ill.1995). Thus, the fact that there is no prior course of dealings between the party does not automatically preclude the court from continuing its analysis under subsection B.

■ The next issue to be resolved is what indicia courts may consider in determining whether the transaction took place in the "ordinary course of business." Courts have widely differed in their views on this issue. Some courts have concluded that "[i]n the absence of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract." *Payne v. Clarendon Nat'l*

*Ins. Co (In re Sunset Sales, Inc.),* 220 B.R. 1005, 1021 (10th Cir. BAP 1998). Other courts have held that, in conducting an analysis under subsection B, "[t]he Court need not ... rely solely upon the previous transactions between the parties, but also may look to similar transactions between either of the parties and third persons in determining whether the transfer was 'ordinary.'" *Energy Coop., Inc. v. Fina Oil & Chemical Co. (In re Energy Coop., Inc.),* 103 B.R. 171, 176 (N.D.Ill.1986). Finally, other courts have concluded that "[i]t is what is normal between the two parties that controls, not necessarily the printed words of an invoice." *Tomlins v. BRW Paper Co. (In re Tulsa Litho Co.),* 229 B.R. 806, 810 (10th Cir. BAP 1999); *Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry, Co.),* 92 B.R. 737, 741 (W.D.Mich.1988).

In *In re Morren Meat & Poultry,* Morren purchased meat from ASC only once, and the order totaled $41,580. The pre-printed invoice set forth the terms of the order as follows: "TERMS—NET CASH 7 DAYS ... A service charge of 1/5% per month may be computed on all balances outstanding over 30 days. Annual percentage rate 18%." ASC received one check for half the amount of the invoice 31 days after the invoice date and 27 days after receipt of the goods. A second check for the remaining balance was received 40 days after the date of the invoice and 36 days after delivery of the goods. The court found no evidence that ASC demanded payment within seven days or attempted to collect service charges as indicated by the terms on the invoice and concluded that the transfers fell within the ordinary business exception. The Court recognized that the parties had not established a course of dealing among themselves given the fact that the transfer in question was the only transaction entered into among the debtor and creditor; however, the court took into consideration the two check payments, even though they were the only dealings and took place within the preference period, and concluded that

[T]his Court is not convinced that here, in the case of an isolated transaction preprinted terms on a[sic] invoice definitively define the ordinary course of business for purposes of § 547(c)(2).

While the ordinary course of business remains undefined, this Court notes the absence in these two transfers of any indicia suggesting unusual conduct between Morren and ASC removing the transfer out of the ordinary course of business. The transfers were simply payments on an open book account with no unusual attempts at collecting on the debt.

*Id.* at 741. The Court adopts this view and holds that the contract between the parties is not the sole factor to look at; rather, the Court also must consider other factors, such as the conduct of the parties to determine whether any unusual conduct took place which would require the Court to set the subject transactions aside as preferential pursuant to § 547(b).

■ As discussed above, factors that the Court must consider when conducting an analysis under subsection B are the timing of the transfers, the amount and manner of the transfer, and the circumstances under which the transfer was made. *See Huffman v. New Jersey Steel Cop. (In re Valley Steel Corp.),* 182 B.R. 728, 736 (Bankr. W.D.Va.1995); *Levy v. Gatlin (In re Gardner Matthews Plantation Co.),* 118 B.R. 384, 385 (Bankr.D.S.C.1989). In *Solow v. Ogletree, Deakins, Nash, Smoak & Stewart (In re Midway Airlines, Inc.),* 180 B.R. 1009 (Bankr.N.D.Ill.1995), the debtor had hired a law firm prior to the preference period and the limited extent of the parties' prior course of dealing consisted of two relatively small invoices issued and paid in 1989. The invoices were for general counseling services and were paid 29 days and 42 days after the issuance of the invoices. The two preferential transfers at issue in that case involved the payments of

two invoices; which were paid 140 and 167 days after the issuance. The court found that the payments covered by the 1989 invoices were different in nature from the transfers alleged to be preferential. Whereas in 1989 the law firm had charged Debtor for general counseling, the transfers in question involved the payment of fees for representation in a union organizing campaign. This latter work was characterized as far more complicated than the previous work, and the fees were much larger. "The Court found that this credible testimony established that the nature of the work performed was more extensive than the general counseling performed in 1989, and thus, [the law firm] did not expect to be paid as quickly as it had been in 1989." *Id.* at 1014. The court rejected the trustee's argument that the statistical comparison of the timing of payments made during and before the preference period was determinative of whether the payments were made in the ordinary course of business.

The Court finds that this statistical analysis does not determine, per se, if the preferential payments were outside of the parties' ordinary course of business. Certainly this mode of analysis is one factor that the court can consider, and did in fact consider, but it is not the sole ultimate determinative factor. Rather, the Court looked to the more significant factors: the different nature of the work performed during the preference period; the lack of any unusual collection activity by Ogletree; and the lack of any express payment time or terms for the payment of the subject work. These factors persuaded the Court to conclude that the subject payments made were within the ordinary course of dealings between the parties under section 547(c)(2)(B).

*In re Midway Airlines, Inc.,* 180 B.R. at 1015.[9]

---

**9.** The Court realizes that, as opposed to the facts in *In re Midway Airlines, Inc.,* in which there was no agreement between the parties

as to when payment would be due or made, SAI and Debtor had entered into a specific Agreement which set forth the various pay-

In this case, there is no question that the three pre-preference payments were made on time while the two alleged preference payments were made thirteen and nine days after the written invoice required. Nonetheless, the parties' conduct and the circumstances surrounding the payments demonstrate the preference payments were part of a normal business transaction. In terms of the parties' conduct, SAI intentionally permitted Air South to slightly extend the payment terms of the contract and the final invoice. The letter dated June 12, 1997 from the Vice President of SAI anticipated the fact that Debtor would need time to review the final invoices. The letter also recognized the fact that SAI did not have all the underlying documents that would allow a full itemization of the final invoice. Furthermore, SAI did nothing to attempt to collect on the balance or take unusual collection action. In terms of the circumstances surrounding the preference payments, the majority of work billed in the final invoice was considerably different than the work billed pre-preference. The outstanding balance due was predominantly comprised of the non-routine work performed that exceeded the cost contemplated in the bid package of the original contract. Pursuant to ordinary business practice, Debtor conducted due diligence in reviewing the final invoice prior to payment.[10]

■ Section 547(b) was enacted to discourage creditors from engaging in unusual collection practices and to assign to the Trustee the authority to avoid such unusual transfers. The Court finds that, when considering the conduct of SAI and Debtor and the circumstances of the payments in question, there is no indication that the parties engaged in unusual payment and collection activities. Therefore, the Court finds that the transfers at issue meet the "ordinary course of business" test set forth in subsection B.

**4. Section 547(c)(2)(C)Objective Test**

■ Subsection C of the ordinary course of business exception is an objective inquiry into the broad range of terms in the relevant industry. The Fourth Circuit Court of Appeals set the standard when determining whether preference payments were made according to "ordinary business terms" as "the norm in the creditor's industry." *See Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1047 (4th Cir. 1994). The benchmark from which the court determines whether a preferential transfer meets the requirements of subsection C varies according to the length of time that the parties have had a business relationship.

[W]hen the debtor-creditor relationship is of recent origin the industry norm becomes crucial because "there is no baseline against which to compare the pre-petition transfers at issue to confirm the parties would have reached the same terms absent the looming bankruptcy." On the other hand, when the parties have an established relationship, the terms previously used by the parties in their course of dealing are available as a potential baseline. The industry norm, though still relevant, becomes less significant.

*Advo–System, Inc.*, 37 F.3d at 1049.

■ The Trustee's expert, Robert E. Faulkner, concluded that "the average length of time taken to collect trade receivable in the repair service industry in 1997 was approximately thirty-five (35) days."

---

ments due by Debtor. However, this factual difference does not affect the holding of the Court.

**10.** The Report of David Willse, retained by SAI as an expert witness in the case, indicates that "[t]he time interval of 11 days from invoicing to payment date is well within the

ordinary course. The work package on a project of this size, where the 'Non routine' costs exceed the basic bid, requires significant review by the customer. From my experience, and considering the added progress payment, this payment was, well within the ordinary course."

SAI's expert, David Willse, opined that "[his] experience has been that the payments for final balances on heavy maintenance programs could extend from 30–60 days from the date the aircraft was released back to the air carrier."[11] As set forth in *Advo–System, Inc.*, the standard to be considered is "the norm in the creditor's industry." *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1047 (4th Cir.1994). In this case, the norm the Court considers is the aircraft repair service industry, and evidence before the Court shows that the norm in that industry was to pay for final balances on heavy maintenance work from thirty to sixty days after the release of the aircraft. SAI and Debtor's conduct evidences a slight variation from the payment terms outlined in the contract and in the final invoice of June 13, 1997. Debtor's last two payments were thirteen days and nine days late. As already discussed in a footnote above, the proper date to consider for purposes of the affirmative defenses set forth in § 547(c)(2) is the date the check is received by the creditor, not the date the check was written or the date it was honored by the drawee bank. In this case, the only evidence before this Court is the date that the check was written. Therefore, it can be inferred that the actual transfer occurred later than nine and thirteen days after the due date; however, such further delay would still fit within the industry norm, thus satisfying the requirements of subsection C. In regards to subsection C, the Trustee also argues that the preferential payments in question were paid much quicker than the industry norm; therefore, because Debtor paid SAI at an accelerated rate shortly before its bankruptcy case was filed, there is indicia of a preferential transfer. The Court finds no such overreaching by the parties and concludes that the business dealings were normal.[12] Debtor paid SAI in full for its maintenance work 26 days from SAI's release of the aircraft. The invoice reiterated the contract terms between the parties and specified that the last two payments were due on return of the aircraft on June 11, 1997 and fifteen days from certified delivery of the final invoice respectively. The payments were made thirteen days and nine days later than specified in the Agreement, well within the norms of the industry. The Court concludes that the transfers in question were all consistent with the industry norms; therefore, the requirements of subsection C are also met.

## CONCLUSION

For the reasons stated within, it is therefore,

**ORDERED** that the payments of June 13, 1997 and July 7, 1997 were paid in the ordinary course of business pursuant to § 547(c)(2); therefore, summary judgment is granted in favor of SAI. Furthermore, the Trustee's Motion for Summary Judgment is denied.

**AND IT IS SO ORDERED.**

---

**11.** David Willse based his opinion on his experiences while working as Vice-president Controller at Southern Air Transport and as CFO at Rich International Airways. His responsibilities while employed in those two positions included accounting for maintenance and engine financial reserves associated with the aircraft fleet.

**12.** The Court also notes that, because the date the check was received by SAI is the relevant date of the transfer, it can be inferred that the payments in question were later than that cited by the Trustee in his argument.