Filed:  June 14, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 99-1022
(CA-98-814-CCB, et al)

Robert A. Gordon, et al,

Plaintiffs - Appellees,

versus

Siems Rental & Sales Co., Inc.,

Defendant - Appellant.

O R D E R

The court amends its opinion filed June 7, 2000, as follows:

On the cover sheet, section 4 -- "Argued:" is inserted before the April 7, 2000, date.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: M.P. INDUSTRIES,
INCORPORATED,
<u>Debtor.</u>

ROBERT A. GORDON; ALAN M.
GROCHAL,                                                    No. 99-1022
<u>Plaintiffs-Appellees,</u>

v.

SIEMS RENTAL & SALES COMPANY,
INCORPORATED,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-98-814-CCB, BK-93-55283,
AP-97-5070)

Argued: April 7, 2000

Decided: June 7, 2000

Before LUTTIG, Circuit Judge, Roger J. MINER,
Senior Circuit Judge of the United States Court of Appeals
for the Second Circuit, sitting by designation, and
Patrick M. DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** William Charles Bailey, Jr., GREBER & SIMMS, Baltimore, Maryland, for Appellant. Mary Fran Theresa Ebersole, TYDINGS & ROSENBERG, L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** J. Stephen Simms, GREBER & SIMMS, Baltimore, Maryland, for Appellant. Alan M. Grochal, TYDINGS & ROSENBERG, L.L.P., Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This matter arises in the context of a Chapter 11 Bankruptcy. Siems Rental & Sales Company (hereinafter "Siems") petitions this court to review the District Court's grant of summary judgment to the Distribution Agents for the Use of the Official Committee of Unsecured Creditors Grochal and Gordon (hereinafter "the Agents"), in which the District Court affirmed the Bankruptcy Court's decision. This court has jurisdiction over this case pursuant to 28 U.S.C. § 158(d).

I. <u>BACKGROUND</u>

The facts, viewed in the light most favorable to Siems, are as follows: M.P. Industries (hereinafter "MP"), the debtor in this case, was a Maryland corporation engaged in the business of commercial and industrial painting. MP operated either as a general contractor or as a subcontractor, depending on the nature of the job. Siems was MP's primary supplier of short-term industrial equipment rentals from 1989 until MP filed for bankruptcy in 1993.

MP's Chief Financial Officer Tony McLaughlin testified that MP gave first priority to paying its weekly payroll-related expenses, and

2

that equipment rentals "were normally paid as cash flow would allow." J.A. at 754. MP's cash flow was dependent upon its customers' payments. However, because MP's customers were often slow in making their payments, MP's invoices with Siems would remain open for substantial periods of time. Accordingly, MP almost never paid an invoice within the ten-day period, as required by the invoice's terms. Rather, invoices remained open anywhere from 52 to 386 days after invoice receipt throughout 1992 and 1993. J.A. at 22-23.

On August 3, 1993, MP filed a petition under Chapter 11 of the United States Bankruptcy Code. Within ninety days prior to MP's filing for bankruptcy, Siems cashed two checks from MP. The first check, covering 11 short-term rental invoices that had been open from 124 to 210 days, cleared on or about June 7, 1993, and totaled $7,196.42. The second check, covering 18 short-term rental invoices that had been open from 49 to 132 days, cleared on or about July 21, 1993, and totaled $25,776.81.

On January 22, 1997, the Agents filed a Complaint to Avoid and Recover Preferential Transfers against Siems. The Agents alleged in the Complaint that the two checks (hereinafter the "Transfers" or "Payments") constituted "preferential" payments, and requested that the Bankruptcy Court avoid the Payments under 11 U.S.C. § 547(b).

On January 15, 1998, the Bankruptcy Court conducted a full evidentiary trial. At trial, Siems did not dispute that the Payments met the definition of a "preferential" transfer under section 547(b).[1] Rather, Siems alleged that under section 547(c)(2)'s "ordinary course of business" exception, the preferential Payments should not be avoided.[2] In an oral opinion issued from the bench,[3] the Bankruptcy

_____

[1] "Generally, when a debtor makes a payment to an unsecured creditor within 90 days before a bankruptcy petition is filed, that payment is a `preference.'" Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1045 (4th Cir. 1994) (citing 11 U.S.C. § 547(b)).

[2] Siems also asserted the "new value" defense under 11 U.S.C. § 547(c)(4) in its attempt to keep the Payments from being avoided. On this defense, the Bankruptcy Court ruled that Siems was entitled to a credit for new value which it had extended to MP to the extent of

3

Court rejected this defense, and held that section 547(c)(2) did not protect the Transfers from avoidance. Accordingly, the Bankruptcy Court issued a written Order**4** avoiding the Transfers as preferential, and entering a judgment in favor of Plaintiffs in the amount of $30,897.46.**5**

Subsequently, Siems appealed the Bankruptcy Court's Order to the United States District Court for the District of Maryland. On November 30, 1998, the District Court, in a one-and-half-page conclusory opinion, affirmed the Bankruptcy Court's Order. J.A. at 867-68. The instant appeal by Siems followed on December 29, 1998.

II. ISSUES

The issue for this court's review is whether the lower court should have accepted Siems's defense that section 547(c)(2)'s "ordinary course of business" exception protected the Transfers from avoidance.

III. STANDARD OF REVIEW

Since the District Court sat as an appellate court in bankruptcy, this court conducts a plenary review of the District Court's decision. In Re K & L Lakeland, Inc., 128 F.3d 203, 206 (4th Cir. 1997). The court "review[s] the bankruptcy court's factual findings for clear error, while we review questions of law de novo." Id. (citations omitted); see In re Jeffrey Bigelow Design Group, Inc., 956 F.2d 479, 481-82 (4th Cir. 1992) ("While courts disagree on the standard of review for decisions involving the ordinary course of business exception to voidable preferences, the Fourth Circuit has adopted the clearly erroneous

_____

$2,075.99. Siems did not appeal this part of the Bankruptcy Court's decision to the District Court. Thus, the Bankruptcy Court's decision concerning Siems's "new value" defense is not at issue in this appeal.

**3** This oral opinion can be found on pages 844-864 of the Joint Appendix ("J.A.").

**4** This order can be found at pages 865-866 of the J.A.

**5** This sum represents the $32,973.45 total of the Transfers less the $2,075.99 new value credit.

4

standard.") (citations omitted). "Obviously, the clearly erroneous standard will not insulate findings made on the basis of the application of incorrect legal standards." Id. (citation and internal quotations omitted).

IV. DISCUSSION

A. The Law of Section 547 and Its Underlying Policies

Generally, when a debtor makes a payment to an unsecured creditor within 90 days before the filing of a bankruptcy petition, that payment constitutes a "preference" under 11 U.S.C. § 547(b). Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1045 (4th Cir. 1994). The trustee in bankruptcy may recover such a payment from the unsecured creditor, thereby forcing that creditor to stand in his proper place with regard to the rest of the debtor's unsecured creditors. Two major policies drive section 547(b):

> First, the avoidance power promotes the "prime bankruptcy policy of equality of distribution among creditors" by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate. Second, the avoidance power discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor and offers a concurrent opportunity for the debtor to work out its financial difficulties in an atmosphere conducive to cooperation.

Id. at 1047.

It is not disputed in this case that the two Transfers constituted preferential payments. "However, the unsecured creditor has several shields with which it can defend against the trustee's avoidance power." Id. (citing 11 U.S.C. § 547(c)). One such shield is section 547(c)(2)'s "ordinary course of business" exception. Id. This exception says that the trustee may not avoid a debtor's payment to an unsecured creditor if the creditor can establish that (1) the underlying debt on which payment was made was "incurred by the debtor in the ordinary course of business or financial affairs" of the debtor and

5

creditor ("Subsection A"), (2) the transfer was "made in the ordinary course of business or financial affairs" of the debtor and creditor ("Subsection B"), and (3) the transfer was made "according to ordinary business terms" ("Subsection C"). Jeffrey Bigelow, 956 F.2d at 486 (citing 11 U.S.C. § 547(c)(2)).

The Code fails, however, to define these phrases. The legislative history states simply that the "purpose of this exception is to leave undisturbed normal financial relations, because it[such an exception to the trustee's general avoidance powers] does not detract from the general policy of the general preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S. Rep. No. 989, 95th Cong., 2nd Sess. 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874. Thus,"those courts testing a transfer for 'ordinariness' under section 547(c)(2) have generally focused on the prior conduct of the parties, the common industry practice, and, particularly, whether payment resulted from any unusual action by either the debtor or creditor." Jeffrey Bigelow, 956 F.2d at 486 (citing 4 Collier on Bankruptcy ¶ 547.10, at 547-50 to -51 (15th ed. 1990)).

The underlying issues raised in this appeal are whether Siems has satisfied Subsections B and C, i.e., whether it has proved that the two Payments were "made in the ordinary course of business or financial affairs" of the debtor and creditor, and that the Payments were made "according to ordinary business terms."**6** If Siems failed to prove either one of these elements, then we must affirm the District Court's Order upholding the Bankruptcy Court's decision. We shall examine the requirements of Subsection C first.

_____

**6** Subsection A is not at issue as the Agents acknowledge that MP incurred the debts owed to Siems in the ordinary course of MP's and Siems's business. Appellee's Brief at 9 n.7.

6

B.       Whether the Bankruptcy Court Erred in Finding that the Two Payments Were Not Made in Accordance with Ordinary Business Terms for the Industry Under Subsection C of Section 547(c)(2)

In Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1048 (4th Cir. 1994), we held that when analyzing whether a preference payment comports with subsection C's "ordinary business terms" of the industry, courts must employ an objective test, where they "look to the norm in the creditor's industry." In elaborating on how courts should apply this test, we adopted the Seventh Circuit's rule as stated in In re Tolona Pizza, 3 F.3d 1029 (7th Cir. 1993), and as explained and modified by the Third Circuit in In re Molded Acoustical Products, Inc., 18 F.3d 217 (3d Cir. 1994). In Tolona Pizza, the Seventh Circuit stated that "`ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." 3 F.3d at 1033. We asserted in Advo-System that the Seventh Circuit's objective approach to subsection C has two salient features:

> First, it pragmatically defines "ordinary business terms" to encompass the "broad range" of terms used in the relevant industry. Consequently, the creditor is spared the task of proving the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist [within the relevant industry]. Indeed, to suggest that an entire industry should have a single set of credit terms would be inconsistent with antitrust policy. Second, Tolona Pizza broadly defines the relevant industry to encompass "firms similar in some general way to the creditor," recognizing that in most cases it is "difficult to identify the industry whose norm shall govern."

Advo-System, 37 F.3d at 1048-49 (internal citations and some internal quotations omitted).

In Molded Acoustical, the Third Circuit "embellished the Seventh Circuit test . . . with a rule that subsection C countenances a greater

7

departure from that range of terms, representative of the industry norm, the longer the pre-insolvency relationship between the debtor and creditor was solidified." Id. at 1049 (citation omitted). In Advo-System, we stated the contours of that rule as follows:

> The more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2). A "sliding-scale window" is thus placed around the industry norm. On one end of the spectrum, when the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry. In such a case, only those departures from the relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection. On the other end of the spectrum, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C
> . . . .

Id. However, we were careful to state in Advo-System that the parties' established credit terms, although unwavering as between them, "may depart so grossly from what has been established as the pertinent industry's norms that they cannot be seriously considered usual and equitable with respect to the other creditors." Id.

We thus noted that "the most important thing, as far as the preference statute is concerned, is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period." Id. (quoting Tolona Pizza , 3 F.3d at 1032). However, where the debtor and creditor have only recently begun their relationship, the industry norm becomes critical because "there is no baseline

8

against which to compare the pre-petition transfers at issue to confirm [that] the parties would have reached the same terms absent the looming bankruptcy." Advo-System, 37 F.3d at 1049-50 (quoting Molded Acoustical, 18 F.3d at 226). On the flip side,"when the parties have an established relationship, the terms previously used by the parties in their course of dealing are available as a potential baseline. The industry norm, though still relevant, becomes less significant." Id. at 1050. Such an emphasis on the length of the parties' relationship effectuates the major policies underlying the preference provisions.

In light of the foregoing, we summarized our ruling regarding how courts should apply Subsection C as follows:

> We read subsection C as establishing the requirement that a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection. In addition, when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C. But subsection C never tolerates a gross departure from the industry norm, not even when the parties have had an established and steady relationship.

Advo-System, 37 F.3d at 1050 (citations omitted).

Turning to the Bankruptcy Court's Subsection C ruling in this case, the court found that MP did not make the two preference Payments in accordance with the ordinary business terms of the relevant industry. Initially, under the sliding scale framework, the Bankruptcy Court decided to use the forty-five-day industry standard, and not the alleged standard practice between Siems and MP, as its baseline. The Bankruptcy Court relied on several points in making this determination. First, it found that the longevity of Siems's and MP's relation-

9

ship had not been established because Siems had offered statistical analysis covering only a one-year period (1992-1993) prior to the preference period. Moreover, the Bankruptcy Court maintained that Siems offered conflicting testimony concerning the parties' practice before 1992, as Siems's Codd testified that MP averaged 170 days for payments, while MP's McLaughlin testified that MP averaged 60 to 90 days for payments. These findings were supported by the evidence and were not clearly erroneous. Accordingly, the Bankruptcy Court was not incorrect in turning to the industry standard and declining to use Siems's and MP's alleged standard as its baseline.

Next, the court determined that forty-five days for payment represented the industry standard. The court based this decision on a couple of factors. First, the court focused on the testimony of the Agents' expert, Mark Welsh, who testified that "45 days at the outside was the limit of ordinary business terms and that the better practice was less."[7] Second, the court noted McLaughlin's testimony that an invoice open for more than forty-five days would be "pretty liberal" for a company like MP. These two points certainly support the court's use of forty-five days as the industry standard. Moreover, Siems offered no contrary evidence of the industry standard. Rather, Siems attempted to show only that it and MP engaged in similar late-payment practices with their other debtors and creditors, respectively. However, the Bankruptcy Court was not required to reject Welsh's 45-day standard

_____

[7] J.A. at 853. Siems argues that the court's reliance on Welsh's testimony was inappropriate because Welsh is in the long-term rental and rent-to-own industry of larger commercial equipment, whereas Siems is in the short-term rental industry of smaller commercial equipment. We reject this argument for several reasons. First, the Agents argue that Siems failed to object to the Bankruptcy Court's qualification of Welsh as an expert in either its District Court appeal or the instant appeal. Siems does not offer evidence or argument to the contrary. Thus, Siems's argument falls short on procedural grounds. Siems's contention also fails on the merits. Welsh testified that he leases many types of commercial equipment, with some equipment similar to the equipment leased by Siems, such as small forklifts and compressors. Moreover, regardless of the type of rental company for which Welsh worked (i.e. short-term rentals or rent-to-own leases), Welsh's extensive background in the commercial equipment rental industry illustrates his competency to testify as an expert on rental industry payment practices.

10

in favor of Siems's and MP's employees' testimony that Siems and MP worked under similar 170-day arrangements (i.e. "pay us when you get paid" arrangements) with other companies, for this testimony did not concern the industry-wide practice, but only the practice in Siems's and MP's respective business experiences. The Bankruptcy Court therefore was not in error to use 45 days as its baseline for the ordinary course of business under subsection C, and not the 170-day period as Siems argues the sliding scale analysis requires.

Turning to the Bankruptcy Court's application of the 45-day base-line, the court first concluded that Siems's perception that MP would pay, on average, within 170 days is "way beyond, no matter what kind of sliding scale you use, any industry norm." J.A. at 854. Moving on to look specifically at the first Payment, the court found that the closest MP came to paying an invoice within the 45-day industry standard was 124 days, with Siems holding open the oldest invoice for 210 days. The court concluded that while 124 days was within 170 days, the 124- to 210-day range was still three to five times the industry standard. J.A. at 855. The court also noted that 210 days fell outside even the 170-day range under which Siems believed it and MP were operating.

The Bankruptcy Court's finding that 170 days is "way beyond" the 45-day industry norm is not clearly erroneous. While in Advo-System we held that when there is an established trade relationship, the industry norm, though still relevant, becomes less significant, we also stated that Subsection C does not permit a gross aberration from the industry norm, not even when the parties have worked under an established and steady relationship. Consequently, the Bankruptcy Court did not erroneously hold that the 124- to 210-day range for the invoices covered by the first check represented a gross departure from the 45-day industry standard. Accordingly, its ruling that Siems did not prove that the first Payment fell within Subsection C's ordinary course of business was not clearly erroneous.

As to the second check, the Bankruptcy Court noted that the invoices remained open between 49 and 132 days, with 12 of the 18 invoices ranging open from only 49 to 63 days.**8** The court conceded

_____

**8** J.A. at 855. The Bankruptcy Court stated at one point in its oral opinion that 18 of the invoices were held open between 49 and 63 days, but

11

that if the standard maximum for the industry was 45 days, then these 12 invoices could arguably fall within the standard business terms of the industry under the sliding scale approach. J.A. at 856. However, the Court went on to state that the 49- to 132-day range was an aberration from the 170-day practice allegedly employed by Siems and MP. Id. In light of this, the Bankruptcy Court seemingly suspected that Siems had attempted to jump ahead of MP's creditors, and refused to pull the 12 invoices into the 45-day industry standard. Id. Thus, the court held that the second check did not fall within the ordinary practice of the parties or the ordinary business terms of the industry. Accordingly, the court found that Siems failed to prove by a preponderance of the evidence that MP paid the second check in the ordinary course of business under Subsection C.

Regarding the 4 invoices held open between 114 and 132 days, we uphold, for the same reasons we upheld its ruling on the first check, the Bankruptcy Court's ruling that these invoices fell outside the standard industry practice of making payments within 45 days. Turning to the remaining invoices, at first blush, the Bankruptcy Court's holding for the 14 invoices held open between 49 and 78 days[9] seems problematic. For these 14 invoices, the Bankruptcy Court used the 170-day standard urged by the parties, whereas it had refused to use the 170-day standard for the first check. Finding that the invoices covered by the second check did not fall within the 170-day period, it refused to pull the 14 invoices, just outside the 45-day industry standard, within that industry standard.

However, in light of the main purposes behind section 574(b), the Bankruptcy Court's rulings were appropriate. Since only 4 of 39 invoices over the past year-and-a-half had been paid in less than 100 days, it certainly seems that MP was suddenly in a rush to pay off

_____

the statistics show that this was the case for 12 of the second check's 18 invoices, and the court elsewhere in its ruling confirmed this. Obviously, the Bankruptcy Judge simply misstated the number. See id. at 856.

[9] The Bankruptcy Court should have grouped together fourteen invoices that were paid off between 49 and 78 days, and not just the twelve invoices paid off between 49 and 63 days, as 78 days does not represent a gross departure from the 45-day standard.

12

Siems on the eve of the bankruptcy filing. Indeed, the 49- to 74-day range falls far short of the 170-day average testified to by Codd, or the 196-day average evinced by Siems's statistical evidence covering the year-and-a-half prior to the preference period. The Bankruptcy Court was thus not in error to perceive this scenario as one section 574(b) is supposed to protect against: creditors like Siems trying to outmaneuver each other to carve up a debtor's assets just before the debtor files for bankruptcy, thereby preventing an equal distribution of the bankrupt debtor's assets to its creditors. The Bankruptcy Court, by refusing to pull the invoices into the 45-day industry standard, acted in accordance with the fundamental policies of the preference statute. Accordingly, we affirm the Bankruptcy Court's determination that the second check fell outside of Subsection C's ordinary business terms.

Because we find that the Bankruptcy Court was not in error to hold that the two Payments were not made in accordance with ordinary business terms for the industry under Subsection C, we need not reach the issue raised under Subsection B as to whether the two Payments were made in the ordinary course of business between Siems and MP.

V. <u>CONCLUSION</u>

We affirm the District Court's Order upholding the Bankruptcy Court's decision to reject Siems's ordinary course of business defense, and to avoid the two Payments.

<u>AFFIRMED</u>

13